STATE OF NORTH CAROLINA v. THURMAN MARTIN

No. 36

(Filed 2 June 1981)

**1. Homicide § 21.5— first degree murder—sufficiency of evidence**

The State's evidence tending to show that defendant twice told his wife he was going to kill her and that he did kill his wife some six months later in a most brutal manner was sufficient to be submitted to the jury on the issue of defendant's guilt of first degree murder.

**2. Criminal Law § 135.4— first degree murder—aggravating circumstance—especially heinous, atrocious, or cruel crime—sufficiency of evidence**

The evidence was sufficient to support a finding that defendant's first degree murder of his estranged wife was especially heinous, atrocious, or cruel within the contemplation of G.S. 15A-2000(e)(9) where it tended to show that immediately after the wife entered a neighbor's apartment, defendant ran into the apartment and fired two shots at the wife, who slumped down and fell to her knees; defendant told his wife to get up, but she told defendant she could not move her legs; defendant then dragged her across the room into a small hallway, held her up with his left hand and hit her four or five times with the pistol, and thereafter slung her against the wall and hit her several times in her face with the pistol; defendant then told his wife he ought to kill her and she begged him not to hit her anymore; defendant then slung his wife against the wall in the hall and hit her on the head five or six times with his fists; while defendant was beating his wife in the hall, two shots were fired, but they did not appear to strike the wife; thereafter, while his wife was on the floor, defendant fired another shot down toward the floor; the couple's four-year-old child came into the room calling for his mother, defendant fired another round at his wife in the presence of the child, his wife told the child to leave, and the youngster fled from the room crying; defendant's wife continued to plead for her life throughout the episode and asked that someone be allowed to call an ambulance because she was dying; defendant then fired three more shots at his wife and "clicked" the gun five more times at her and thereafter laid the gun on a table; approximately twenty to twenty-five minutes elapsed between the time defendant's wife entered the apartment and defendant laid the gun on the table; a post-mortem examination revealed that defendant's wife received six gunshot wounds, three to her head, two to her body, and one to her elbow; and it was the opinion of the pathologist that one of the first bullets that wounded defendant's wife severed her spinal cord and caused immediate paralysis and that either of the two bullets which entered her head would have caused instant death.

**3. Criminal Law § 135.4— especially heinous, atrocious, or cruel murder—statute not unconstitutionally vague**

The aggravating circumstance of an "especially heinous, atrocious or cruel" murder set forth in G.S. 15A-2000(e)(9) is not unconstitutionally vague

when interpreted to permit the imposition of the death penalty based on such factor only in those situations where the evidence showed that the murder was committed in such a way as to amount to a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

**4. Criminal Law § 135.4—death penalty not excessive or disproportionate**

Sentence of death imposed upon defendant for the first degree murder of his estranged wife will not be set aside where the evidence supported a jury finding that the murder was especially heinous, atrocious, or cruel, the record does not indicate that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and the sentence of death is not excessive or disproportionate considering both the crime and the defendant.

APPEAL by defendant from judgment of *Rouse, J.,* entered at the 11 February 1980 Criminal Session of SCOTLAND Superior Court.

By an indictment proper in form, defendant was charged with the first-degree murder of his wife, Peggy Lupo Martin. He entered a plea of not guilty, and the state presented evidence summarized in pertinent part as follows:

On 5 July 1979, the date of the alleged murder, defendant and Peggy Lupo Martin were husband and wife, but they had been living separate and apart since August 1978. The couple's two small children lived with Mrs. Martin in an apartment in Laurinburg, North Carolina.

On 6 January 1979, defendant went to Mrs. Martin's residence and tampered with her automobile. Pursuant to a telephone call from Mrs. Martin, her friend Mrs. Gladys Grant and her husband went to the apartment to take Mrs. Martin and her children to her parent's home. While the Grants were trying to get Mrs. Martin and the children away from the apartment, defendant told Mrs. Martin: "Peggy, I'm going to kill you . . . I mean it. I'm going to kill you."

Prior to 4 July 1979, Mrs. Martin had dated Michael Bridges, a Scotland County deputy sheriff, three times. Deputy Bridges was divorced. They dated on 4 July 1979, and Deputy Bridges took Mrs. Martin home around midnight. After her companion left, Mrs. Martin drove to another part of Laurinburg to pick up her children at the home of a babysitter.

On 4 July 1979, Jackie Hulon lived in an apartment next door to that occupied by Mrs. Martin. Between 11:30 and 12:00 on that night he saw someone trying to enter a window of the Martin apartment. At about 12:15 a.m. he saw Mrs. Martin return to her apartment with her children. Several minutes later she ran up to the door of the Hulon apartment and sought entry. As Mr. Hulon admitted her, she stated that someone had been in her apartment and that her gun was missing.

Within a few moments, defendant, with a pistol in his hand, ran into the apartment. He fired two shots and Mrs. Martin fell to the floor. Defendant then ordered Hulon to sit down on the sofa. Thereafter, defendant struck Mrs. Martin several times with his hand, as well as the pistol, and shot her three more times. She died as a result of two shots that entered her head. (Additional details of the killing are hereinafter set out in the opinion.)

After emptying the pistol, defendant walked over to a coffee table, laid the gun down and said, "Well, I've done it." Meanwhile, police had arrived at the scene, and as defendant walked out the front door of the apartment, unarmed, officers arrested him.

Defendant offered no evidence at the guilt phase of the trial. The court charged the jury on possible verdicts of first-degree murder, second-degree murder, voluntary manslaughter and not guilty. The jury returned a verdict finding defendant guilty of murder in the first-degree.

At the sentencing phase of the trial, the state offered no additional evidence. The only evidence defendant presented was the testimony of his mother. She testified that defendant was one of ten children; that although he went to several schools, he was not able to learn; that he was unable to read or write; that he was a nervous person and "if he would get upset, . . . he (would) just go all to pieces"; and that when he was a young boy, he tried to cut himself on several occasions during times of emotional distress.

The court submitted for consideration of the jury only one of the aggravating circumstances enumerated by G.S. § 15A-2000(e) (Cum. Supp. 1979): whether the murder was especially heinous, atrocious, or cruel. The jury found that the murder was especially heinous, atrocious, or cruel. With respect to mitigating circumstances, the jury found that the murder was not committed while

defendant was under the influence of mental or emotional disturbance; that the capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirement of the law was not impaired; and that there were no other circumstances which the jury deemed to have mitigating value.

The jury also found beyond a reasonable doubt that the aggravating circumstance found by them outweighed the mitigating circumstances; and that the aggravating circumstance was sufficiently substantial to call for the imposition of the death penalty. They unanimously recommended to the court that the defendant be sentenced to death.

Pursuant to the verdict and the sentence recommendation of the jury, the court entered judgment imposing the death penalty. Defendant appealed to this court pursuant to G.S. § 7A-27(a) (1969).

- *Attorney General Rufus L. Edmisten, by Assistant Attorney General Donald W. Stephens and Assistant Attorney General James C. Gulick, for the state.*

*Bruce W. Huggins for defendant-appellant.*

BRITT, Justice.

## PHASE I — GUILT DETERMINATION

[1] Although defendant has assigned no error to this phase of his trial, due to the seriousness of the offense and the severity of the punishment, we have carefully reviewed the record of the pretrial, as well as the trial, proceedings.[1]

---

1. The record reveals that on 12 September 1979 the court ordered that defendant be committed to Dorothea Dix Hospital at Raleigh for a determination with respect to his mental condition. On 2 October 1979, a report (dated 26 September 1979) from Dr. Bob Rollins, forensic psychiatrist, was filed with the court. In his report, based on interviews with defendant, observations of his ward behavior, and contacts with his attorney and the arresting officer, Dr. Rollins concluded that although defendant scored only 73 on the Slossen Intelligence Test, "clinically he appears to function in the average range of intelligence"; that his reading is at the 3.9 grade level; that his relatively low I.Q. score is the result of social and educational deprivation; and that "Mr. Martin is capable of proceeding to trial in that he

Murder in the first-degree is the unlawful killing of a human being with malice and with premeditation and deliberation. G.S. § 14-17 (Cum. Supp. 1979); *e.g., State v. Fleming,* 296 N.C. 559, 251 S.E. 2d 430 (1979). Apropos to this case is the following statement by Justice (later Chief Justice) Sharp in *State v. Moore,* 275 N.C. 198, 206, 166 S.E. 2d 652, 657 (1969):

> If defendant resolved in his mind a fixed purpose to kill his wife and thereafter, because of that previously formed intention, and not because of any legal provocation on her part, he deliberately and intentionally shot her, the three essential elements of murder in the first-degree — premeditation, deliberation, and malice — concurred.

The evidence presented by the state in the case *sub judice* is more than sufficient to support the jury's verdict of first-degree murder. The statements made by defendant to his wife in January prior to the killing in July are of particular importance. At that time he told her twice that he was going to kill her and that "I mean it". The evidence showed that he carried out that determination some six months later in a most brutal manner.

We conclude that there was no error in the guilt determination phase of defendant's trial.

## PHASE II — SENTENCE DETERMINATION

By his only assignment of error, defendant contends that the trial court erred in instructing the jury that if they found the murder of Mrs. Martin to be especially heinous, atrocious or cruel that this would be an aggravating circumstance which would permit them to recommend the imposition of the death penalty. We find no merit in the assigment.

### A.

[2] First, defendant argues that the evidence in this case was insufficient to establish that the murder was especially heinous, atrocious, or cruel within the contemplation of G.S. § 15A-2000(e)

---

has an understanding of his legal situation and is able to cooperate with his attorney. At the time of the alleged crime he may have been intoxicated to some degree."

(9) as interpreted by previous decisions of this court, and he cites *State v. Goodman,* 298 N.C. 1, 257 S.E. 2d 569 (1979).

In *State v. Goodman, supra,* the first of our cases to be decided under our new capital sentencing procedure, this court said:

> G.S. 15A-2000(e) (9) states that the jury may consider as an aggravating circumstance justifying the imposition of the death penalty the fact that the 'capital felony was especially heinous, atrocious, or cruel.' While we recognize that every murder is, at least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. By using the word 'especially' the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection. *State v. Stewart, supra; State v. Rust, supra; State v. Simants,* 197 Neb. 549, 250 N.W. 2d 881, *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed. 2d 158 (1977).
>
> The Florida provision concerning this aggravating factor is identical to ours. Florida's Supreme Court has said that this provision is directed at 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.' *State v. Dixon,* 283 So. 2d 1 (Fla. 1973), *cert. denied,* 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed. 2d 295 (1974); *see also, State v. Alford,* 307 So. 2d 433 (Fla. 1975), *cert. denied,* 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed. 2d 1221 (1976). Nebraska has also adopted the Florida construction of this subsection. Both Florida and Nebraska have limited the application of this subsection to acts done to the victim during the commission of the capital felony itself. *State v. Rust, supra; Riley v. State,* 366 So. 2d 19 (Fla. 1979). We too believe that this is an appropriate construction of the language of this provision. Under this construction, subsection (e) (9) will not become a 'catch all' provision which can always be employed in cases where there is no evidence of other aggravating circumstances. *Harris v. State,* 237 Ga. 718, 230 S.E. 2d 1 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed. 2d 251 (1977).

298 N.C. at 24-25, 257 S.E. 2d at 585.

We now turn to a brief review of the evidence which relates to the details of the killing at hand. An eyewitness, Jackie Hulon, testified that immediately after defendant ran into the Hulon apartment, he fired two shots and Mrs. Martin "slumped down and fell" to her knees; that defendant told her get up; that she told defendant she could not walk; that she could not move her legs; that defendant then went to her, placed his right hand around her waist and dragged her across the room into a small hallway; that he then held her up with his left hand and hit her four or five times with the pistol; that he thereafter slung her against the wall and hit her several times in her face with the pistol; that he told her he ought to kill her and she begged him not to hit her anymore; that he then slung her against the wall in the hall and hit her on her head five or six times with his fist; that while he was beating her in the hall, two shots were fired but they did not appear to strike Mrs. Martin; that thereafter, while she was down on the floor, defendant fired another shot down toward the floor; that her small son then entered the apartment, calling his "Mama" at which time defendant fired another shot toward the floor; that she told the little boy to leave and he left the apartment crying; that she continued to plead for her life and asking defendant to forgive her; that she asked that someone call an ambulance because she was dying; that defendant then said, "I hope he does, I'll blow his g.d. brains out"; that defendant then fired three more shots at Mrs. Martin and "clicked" the gun five more times at her; and that thereafter he laid the gun on a table and said, "Well, I've done it". Approximately twenty to twenty-five minutes elapsed between the time Mrs. Martin entered the Hulon apartment and defendant laid the gun on the table.

A post-mortem examination revealed that Mrs. Martin received six gunshot wounds, three to her head, two to her body, and one to her elbow. It was the opinion of the pathologist that one of the first bullets that wounded Mrs. Martin severed her spinal cord and caused immediate paralysis and that either of the two bullets which entered her head would have caused instant death.

Clearly, the evidence for the state tends to show that the brutality of the manner in which defendant murdered his wife exceeded that which is normally present in any killing in that it was unnecessarily tortuous to her, not only from a physical stand-

point, but also from a psychological one as well. Defendant did not murder his wife in a quick and efficient manner. Instead, he repeatedly shot her over a twenty-five minute period. Not until one of the final two shots were fired was she killed. Until that moment, she was physically abused by him in that she was dragged across the apartment of a neighbor in a state of helpless paralysis only to receive further physical abuse in the form of being beaten by defendant, not only with his fists but also with the murder weapon. Throughout the episode, defendant's wife begged for her life, knowing that she could not escape because of her initial wounds. At one point, the couple's four-year-old child came into the room calling for his mother. Defendant fired another round at his wife in the presence of the child. At that point, Mrs. Martin told the child to leave, and the youngster fled out the front door crying. It cannot be argued that this evidence fails to establish a conscienceless or pitiless crime which was committed in disregard for the life of another. *Compare State v. Oliver and Moore*, 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980).

## B.

[3] Second, defendant contends that G.S. § 15A-2000(e) (9) is unconstitutionally vague in that it fails to guide the discretion of the jury at the sentencing phase of the trial. We disagree with this contention.

While it is settled that capital punishment is not invariably cruel and unusual punishment within the meaning of the eighth amendment, *Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859, 96 S.Ct. 2909 (1976); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, --- U.S. --- (1980), it remains the law that those states which choose to extract the penalty of death for specified offenses must not impose the ultimate sanction under sentencing procedures which create a substantial risk that it will be imposed in an arbitrary and capricious manner. *Furman v. Georgia*, 408 U.S. 238, 253, 33 L.Ed. 2d 346, 357, 92 S.Ct. 2726, 2734 (1972) (Douglas, J., concurring); *compare Godfrey v. Georgia*, 446 U.S. 420, 64 L.Ed. 2d 398, 100 S.Ct. 1759 (1980); *Gregg v. Georgia*, 428 U.S. at 189, 49 L.Ed. 2d at 883, 96 S.Ct. at 2932. In other words, because the nature of a sentence of death is qualitatively different from that of any other punishment option

which is available to the state, due process requires that the procedure under which such punishment is pronounced must provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman v. Georgia,* 408 U.S. at 313, 33 L.Ed. 2d at 392, 92 S.Ct. at 2764 (White, J., concurring).

While a jury is not likely to be skilled as a body in handling the information which is brought before it at the sentencing phase of the procedure which is contemplated by North Carolina's scheme for trial of capital offenses, its lack of expertise can be overcome if the jury is given sufficient guidance concerning the relevant factors about the defendant and the crime which he was found to have committed. *State v. Barfield,* 298 N.C. at 352-53, 259 S.E. 2d at 543. Such guidance allows the jury which is impaneled to consider on the basis of all the relevant evidence not only why the death penalty should be imposed in a given case but also why it should not be imposed. *Id.*

Sentencing standards are, by necessity, somewhat general in nature. As we noted in *Barfield,* "while they must be particular enough to afford fair warning to a defendant of the probable penalty which would attach upon a finding of guilt, they must also be general enough to allow the courts to respond to the various mutations of conduct which society has judged to warrant the application of the criminal sanction." *Id.* It was our conclusion in *Barfield* that the issues which are posed to a jury at the sentencing phase of North Carolina's bifurcated proceeding have a common sense core of meaning which jurors sitting in a criminal trial ought to be capable of understanding and applying when they are given suitable instructions by the trial judge.

On its face, G.S. § 15A-2000(e) (9) is clearly general in nature. However, it is not impermissibly so when it is applied in light of the construction which this court has applied to it in *State v. Goodman, supra.* As we noted earlier, in *Goodman* we held that the aggravating circumstance of "especially heinous, atrocious, or cruel" requires that there be evidence that the murder in question involved brutality in excess of that which is normally present in any killing. In so holding we foreclosed any suggestion that G.S. § 15A-2000(e) (9) could be employed as a "catchall" provision which could be submitted when there is no evidence of other ag-

gravating circumstances. In *Goodman*, we did not rely upon the canons of statutory construction alone. Instead, we also drew upon the decisions of the Florida Supreme Court in construing a provision of that state's capital punishment statutes whose language is identical to that of G.S. § 15A-2000(e) (9). In *State v. Dixon*, 283 So. 2d 1 (1973), the Florida Supreme Court interpreted the intent of its legislature in the words "especially heinous, atrocious, or cruel" to authorize the imposition of the death penalty based upon this factor only in those situations where the evidence showed that the murder was committed in such a way as to amount to a conscienceless or pitiless crime which is unnecessarily torturous to the victim. That construction was singled out for consideration by the United States Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 49 L.Ed. 2d 913, 96 S.Ct. 2960 (1976), wherein it upheld the constitutionality of the procedure by which the Florida courts imposed the death penalty. In his opinion, Mr. Justice Powell observed that, "[W]e cannot say that the provision, as so construed, provides inadequate guidance to those charged with the duty of recommending or imposing sentences in capital cases." 428 U.S. at 255-56, 49 L.Ed. 2d at 925, 96 S.Ct. at 2968. Because of the identical language which is utilized in the North Carolina and Florida statutes, as well as the similar construction placed upon that language by this court, as well as by the Florida Supreme Court, we hold that the aggravating circumstance embodied in G.S. § 15A-2000(e) (9) is not unconstitutionally vague.

## C.

[4] As a check against the capricious or random imposition of the death penalty, G.S. § 15A-2000(d) directs this court to review the record in a capital case to determine whether the record supports the jury's finding of any aggravating circumstance, whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *See State v. McDowell, supra; State v. Barfield, supra.*

Our review function in this regard should be employed only in those instances where both phases of the trial of a defendant in a capital case have been found to be without error. *State v. Goodman*, 298 N.C. at 35, 257 S.E. 2d at 590-91. In exercising our role

in the statutory scheme, we must be sensitive not only to the mandate of the legislature but also to the constitutional dimensions of our review. *See Gregg v. Georgia,* 428 U.S. at 204-06, 49 L.Ed. 2d at 892-93, 96 S.Ct. at 2939-40; *Proffitt v. Florida,* 428 U.S. at 258-59, 49 L.Ed. 2d at 926-927, 96 S.Ct. at 2969-70.

We repeat what we said in *Barfield:* "We do not take lightly the responsibility imposed on us by G.S. § 15A-2000(d) (2)." 298 N.C. at 354, 259 S.E. 2d at 544. Consequently, we have meticulously reviewed the record in this case. We have carefully considered the briefs and arguments which have been presented to us.

After full deliberation, we conclude that there is sufficient evidence in the record to support the jury's finding as to the aggravating circumstance which was submitted to it. We find nothing in the record which would indicate that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

The brutal manner in which death was inflicted, which followed defendant's declaration approximately six months previously that he was going to kill his wife, leads us to conclude that the sentence of death is not excessive or disproportionate, considering both the crime and the defendant. We, therefore, decline to exercise our discretion to set aside the sentence imposed.

No Error.