STATE OF NORTH CAROLINA v. ALBERT ANDERSON

No. 84

·(Filed 2 June 1981)·

**1. Constitutional Law § 30— request for discovery—voluntary compliance**

Under the statutory discovery scheme in N. C., neither the State nor defendant is required to respond voluntarily to a request for discovery, but, if either party unequivocally advises the other that it will respond voluntarily to the other's request for disclosure, that party thereby assumes the duty fully to disclose all of those items which could be obtained by court order.

**2. Constitutional Law § 30— voluntary discovery—defendant's failure to pursue**

Any failure of defendant to derive full benefit from the N. C. discovery statutes resulted from his own lack of diligence in pursuing the opportunities for voluntary discovery which the·State offered and in failing actively to pursue his later motion to compel discovery where the State advised defendant's attorney unequivocally that it would respond voluntarily to his request for disclosure; according to the detective investigating the case, he was instructed by the district attorney to provide defendant with anything he wanted in reference to the case; the detective tried unsuccessfully on several occasions to arrange an appointment with defendant's attorney for the purpose of complying with defendant's discovery request; it was not until Thursday before the trial was to begin on Monday that defendant's attorney finally responded to the detective's overtures; the attorney indicated that he was not interested in everything to which he was entitled under a discovery order but that he was interested particularly in any pre-trial statements made by defendant; defendant's attorney apparently knew at this time or had reason to believe that the State was in possession of some letters allegedly written by defendant; two days later the detective delivered to the attorney a transcript of defendant's pre-trial statements and asked if the attorney desired anything else to which the attorney replied negatively; defendant did not file a motion to compel discovery until Thursday before the trial began on Monday; defendant never asked that the motion be ruled on; and the trial judge apparently was not even aware of the motion until the discovery issue arose at trial.

**3. Criminal Law § 75.15— confession—waiver of constitutional rights—mental competency**

There was no merit to defendant's contention that the State failed to demonstrate that he knowingly waived certain of his constitutional rights before making a pre-trial, in-custody, incriminating statement and that he was mentally competent to make the statement where the evidence tended to show that defendant, while under arrest in the intensive care unit of a county hospital, was fully apprised of his constitutional rights; when so advised, he was fully coherent, sitting upright and cleaning his fingernails; he responded that he understood his rights, did not want a lawyer at that time, and would answer questions; defendant·was not questioned immediately because his parents arrived and wished to talk with him and because medical personnel

needed to prepare him for the trip to the Central Prison intensive care unit; approximately one hour later, after defendant had been administered some form of medication, he was put on a stretcher and placed in an ambulance; defendant asked if two police officers were going to be riding with him; when told no, defendant stated his understanding that they were going to talk with him and reiterated his willingness to make a statement; the officers were then summoned and made the trip to Raleigh with defendant; and defendant made his incriminating statement during this trip.

### 4. Criminal Law § 99.2 — conduct of judge — no expression of opinion

There was no merit to defendant's contention that the trial judge's evidentiary rulings and other actions indicated his general hostility to defendant and his counsel and, cumulatively, precluded defendant from receiving a fair trial.

### 5. Criminal Law § 34.7 — defendant's guilt of other offense — admissibility to show motive

In a prosecution of defendant for the first degree murder of his girlfriend with whom he had lived until two weeks prior to the shooting, the trial court did not err in allowing the State to offer evidence that sometime prior to the shooting deceased's mother had ordered defendant off of her premises, where the deceased was residing, and that the incident resulted in defendant's being successfully prosecuted for trespassing on the deceased's mother's premises, since the State's theory of the case was that defendant shot deceased because she rejected his love and attention; much of the State's evidence was offered to prove this motive; and evidence that defendant had been convicted of the trespass was highly relevant to show the broken relationship between defendant and deceased.

### 6. Criminal Law § 112.6; Homicide § 28.7 — defendant's mental capacity — instructions

In a prosecution for first degree murder there was no merit to defendant's contention that his mental disorders prevented him from forming the specific intent to kill which is required for a conviction of first degree murder by premeditation or deliberation, and there was therefore no error in the trial court's refusal to give defendant's requested instruction that evidence of his mental disorders, while not sufficient to establish legal insanity, could be considered on the question of whether he had the capacity to deliberate or premeditate at the time the homicide was committed.

### 7. Criminal Law § 120 — possible punishment for lesser included offense — instructions not required

In a prosecution for first degree murder the trial court did not err or abuse its discretion in failing to instruct on the range of punishment available in the event of a second degree murder conviction, since punishment in such event would have been a matter within the trial court's discretion and would not have been a matter for the jury's consideration, and the jury did not appear to be confused or uncertain regarding the consequences of its verdict; however, since the jury must ultimately determine punishment upon a first degree murder conviction, it was proper, if not required, for the trial judge to so inform it at the guilt determination stage.

8. **Constitutional Law § 63; Jury § 7.11— exclusion of jurors opposed to death penalty—representative jury**

There was no merit to defendant's contention that his constitutional right to a jury selected from a fair cross-section of the community was violated when the prosecutor in a capital case was allowed to inquire into a prospective juror's views as to capital punishment and when all those finally seated were committed to being able to impose the death penalty.

Justice MEYER did not participate in the consideration and decision of this case.

BEFORE *Judge Barefoot,* presiding at the 21 January 1980 Session of BEAUFORT Superior Court, and a jury, defendant was convicted of first degree murder. Upon the conclusion of a sentencing hearing the jury recommended and the court imposed life imprisonment. Defendant appeals of right pursuant to G.S. 7A-27(a). This case was docketed and argued as No. 33, Fall Term 1980.

*Rufus L. Edmisten, Attorney General, by W. A. Raney, Jr., Special Deputy Attorney General, for the State.*

*James R. Vosburgh, Attorney for defendant appellant.*

EXUM, Justice.

Defendant brings forward assignments of error relating to: the admission into evidence of certain items which he contends the state improperly failed to disclose before trial, failure of the trial court to suppress defendant's incriminating statement, numerous evidentiary rulings, failure of the trial court to give a requested charge, portions of the trial court's instructions to the jury, and the jury selection process. We have carefully examined each assignment and conclude that defendant's trial was free from prejudicial error.

The state's evidence tends to show the following: Defendant and the deceased, Sandra Parker, had previously lived together but were separated at the time of the incident in question. At approximately 4:40 p.m. on 9 October 1979 Sandra Parker returned to her Jeep vehicle which was parked near the Washington Square Mall in Washington, North Carolina. A green and silver pickup truck driven by defendant pulled alongside her vehicle; a gun barrel emerged from its window; a shot fired which struck

Ms. Parker in the face; and the pickup truck, after colliding with a parked car, sped off. Law enforcement officials called to the crime scene broadcast a description of the pickup truck over the Police Radio Network. At approximately 5:00 p.m. several deputies spotted a pickup truck which matched the broadcast description parked some nine miles south of Washington. Defendant, who was standing in a nearby phone booth, ran to the pickup truck, grabbed a shotgun and pointed it at the deputies. In response the deputies drew their revolvers and pointed them at defendant, whereupon defendant turned the barrel of the shotgun to his chest and shot himself. Defendant was hospitalized in Pitt County Memorial Hospital. On 22 October, while being transferred to the hospital at Central Prison, defendant made a statement to SBI Agent Young to the effect that "she [the deceased] was the one who made [me] do it." Before he shot deceased defendant had told a state's witness, "I love her [the deceased] and if I can't have her, I'm going to fix it where nobody can't."

The state also offered evidence that defendant obtained the murder weapon by taking it from a friend's truck without the friend's knowledge or permission, that defendant purchased five shotgun shells for the weapon, and that defendant obtained the truck which he used in the killing from another friend without that friend's knowledge or permission. Further, defendant, in a telephone conversation immediately after the shooting and a letter written while in Pitt County Memorial Hospital, made statements to friends that he shot the deceased. The cause of deceased's death was a shotgun wound to the head producing multiple cerebral injuries. Several spent shotgun shells, found in the chamber of the gun and on the floorboard of the truck, were fired from the shotgun taken from defendant.

Defendant's evidence, offered through witnesses other than himself, was to the effect that he had some mental disorders resulting from an automobile accident in 1972. He and the deceased had separated two weeks before the shooting. As a result he was very upset and depressed. He went to a mental health facility for help in dealing with his anger and jealousy. When his mother discussed the shooting with him, "he did not appear to know anything about it."

I

Defendant first challenges the admission of certain evidence which he claims should have been but was not disclosed to him before trial pursuant to our statutory discovery procedures.

By letter dated 29 October 1979 defendant, invoking G.S. 15A-902, requested the state to make "voluntary disclosure . . . of evidence to which the defendant is entitled prior to trial under G.S. 15A-903." On 17 January 1980, the Thursday before trial began on Monday, 21 January, defendant filed a motion to compel discovery which was never ruled on. When Detective Leon Schaeffer, the state's third witness, sought to testify as to the contents of deceased's purse, which included a letter from defendant to the deceased and deceased's driver's license, defendant objected on the ground that the contents of the purse had not been earlier disclosed to him. In the jury's absence defendant's counsel, Mr. Vosburgh, informed the court about his letter requesting voluntary discovery and his motion to compel discovery. Mr. Vosburgh stated that on 17 January Detective Schaeffer:

"asked me what I wanted with reference to the discovery and I told him that I wanted everything I was entitled to under G.S. 15A-903, except that aerial photograph right there, which I have not objected to, except the gun, which I have not objected to or any question about the gun, except the shells that were removed from the gun or were found some other place, and the curtain, side curtain from the Jeep. They were things that I told him that I did not have to have and that I did not care to examine, but that I particularly wanted documentary evidence that would be used, anything either in oral form or in writing form from the defendant I wanted the benefit of that and he did, he reduced to writing or had reduced to writing . . . a statement made by the defendant . . . and . . . he delivered it to me last Saturday morning at my office. I met him down there to receive this, but there was no other documentation, no other statements, no other written information or no other reductions to writing of any alleged oral statements by the defendant, and I was not made aware of any documents in his handwriting that would be . . . that might possibly be used as exhibits

and I think it falls under GS 15A-903(d), and that's on that basis that I make my objection."

The following colloquy between the court and Mr. Vosburgh then occurred:

"COURT: Well how do you . . . what . . . how do you know what you are objecting to?

MR. VOSBURGH: Because I know, I have heard from other sources that there were in the hands of the State some letters allegedly written.

COURT: Did you ask for them?

MR. VOSBURGH: I told them I wanted everything that I was entitled to have under . . . .

COURT: Well, if you heard specifically about letters, then it was your duty to ask them for those letters.

MR. VOSBURGH: I asked for an order compelling them to comply and I have not received it and it's on that basis that I make my objection.

COURT: Well, what does the State say?"

Detective Schaeffer then testified on *voir dire*: He had been directed by the district attorney to provide defendant's counsel with all evidence to which he was entitled. Pursuant to this direction he had approached Mr. Vosburgh "in the hall in the courthouse maybe five or ten times asking him when did he want to get up with me to discuss discovery on this case." He was, however, unable to make an appointment with Mr. Vosburgh where "he could sit down and go over the evidence of the case . . . ." Finally, on either 17 or 18 January, Mr. Vosburgh asked him for a transcript of any statement made by defendant plus all other evidence to which defendant was entitled under G.S. 15A-903. In response to this request Detective Schaeffer on Saturday, 19 January, delivered to Mr. Vosburgh a transcript of defendant's oral statement. Detective Schaeffer asked Mr. Vosburgh at that time if any other evidence was desired. Mr. Vosburgh replied, "No, not that I know of."

At the conclusion of Detective Schaeffer's testimony the trial court overruled defendant's objection to admission of the contents

of the purse. Upon the jury's return Detective Schaeffer testified, over objection, that he found in the purse the deceased's driver's license (Exhibit No. 2) and a letter from defendant to the deceased (Exhibit No. 3). Later in the trial these exhibits were introduced. The letter consisted simply of a short message expressing defendant's love for the deceased and his distress that he had "lost my sweetheart and probably won't ever get her for mine again . . . ." Later in the trial the state also offered a court record showing defendant's conviction for trespassing on premises where, other evidence showed, the deceased lived, and an incriminating letter written by defendant from Central Prison to state's witness Wiggins, from whom defendant obtained the shotgun used in the killing. Although it is not clear from the record, defendant argues in his brief that he objected to these other documentary items on the ground of the state's failure to earlier disclose them. We will assume, for purposes of argument, that this was the basis of defendant's objection.

Our discovery statutes require the trial court to order the state to produce, upon defendant's motion, certain kinds of items under certain conditions. *See generally* G.S. 15A-903. The kinds of items include "written or recorded statements made by the defendant," "a copy of [defendant's] prior criminal record, if any, as is available to the prosecutor," certain tangible objects such as "papers, documents, photographs," etc. *Id.* Certain reciprocal disclosure obligations are placed on defendant. G.S. 15A-905. Before either the state or defendant is entitled to an order requiring the other to disclose, it or he must first "request in writing that the other party comply voluntarily with the discovery request. Upon receiving a negative or unsatisfactory response, or upon the passage of seven days following the receipt of the request without response, the party requesting discovery may file a motion for discovery . . . concerning any matter as to which voluntary discovery was not made pursuant to request." G.S. 15A-902(a).

[1] Thus under our statutory discovery scheme neither the state nor the defendant is required to respond voluntarily to a request for discovery. The request for voluntary disclosure is merely a prerequisite to the filing of a motion for an order requiring disclosure. Ordinarily one party in a criminal action may not complain of the other's failure to respond voluntarily to a request for

disclosure. The remedy for such a failure is to move for a compulsory order.

Our discovery statutes, however, are designed to encourage voluntary disclosures of items which ultimately a party may be ordered to disclose. Thus if either party unequivocally advises the other that it will respond voluntarily to the other's request for disclosure, that party thereby assumes the duty fully to disclose all of those items which could be obtained by court order. *See State v. Jones*, 296 N.C. 75, 248 S.E. 2d 858 (1978).

Further, if any party fails "to comply with [the discovery statutes] or with an order issued pursuant to [them], the court in addition to exercising its contempt powers may (1) Order the party to permit the discovery or inspection, or (2) Grant a continuance or recess, or (3) Prohibit the party from introducing evidence not disclosed, or (4) Enter other appropriate orders." G.S. 15A-910.

[2] Defendant argues that the state undertook voluntarily to comply with defendant's request for voluntary disclosure but that it failed fully to disclose all items which it ultimately offered into evidence and which defendant could have required it to disclose by moving for an appropriate order.

Although the argument is sound in the abstract, it is not supported by the record. Whatever deficiencies occurred in the state's voluntary response were due largely to the actions of Mr. Vosburgh. Apparently the state did advise Mr. Vosburgh unequivocally that it would respond voluntarily to his request for disclosure. According to Detective Schaeffer he was instructed by the district attorney to provide defendant with "anything that he wanted in reference to [the] case." Detective Schaeffer, however, unsuccessfully attempted on several occasions to arrange an appointment with Mr. Vosburgh for the purpose of complying with defendant's discovery request. It was not until Thursday before the trial was to begin on Monday that Mr. Vosburgh finally responded to Detective Schaeffer's overtures. His response, moreover, was equivocal. He indicated to Detective Schaeffer that he was not interested in everything to which he was entitled under a discovery order but that he was interested particularly in any pre-trial statements made by the defendant. Apparently Vosburgh at this time knew or had reason to believe that the

state was in possession of some letters allegedly written by defendant.

Thereafter on Saturday before the trial Detective Schaeffer delivered to Mr. Vosburgh a transcript of defendant's pre-trial statements and asked if Mr. Vosburgh desired anything else. Mr. Vosburgh replied negatively. We note, too, that at this time the state was unaware of defendant's prison letter to state's witness Wiggins. The state learned of this letter on Tuesday, the second day of the trial, when Wiggins testified. The district attorney had never seen the letter until just before he sought to offer it into evidence. The state, consequently, could not have produced this letter prior to trial because it had no knowledge of it.

This is not a case, therefore, like *State v. Jones, supra*, 296 N.C. 75, 248 S.E. 2d 858, in which the state by its responses to defendant's request for voluntary discovery lulled defendant into thinking the state had fully complied when in fact the state had possession of exculpatory evidence which it inadvertently failed to disclose. Indeed this is a case in which defendant, through counsel, failed properly to respond to the state's efforts of voluntary disclosure and then lulled the state into thinking that it had given defendant everything he wanted. Defendant may not therefore complain of whatever deficiencies that might have existed in the state's voluntary response.

Neither can defendant complain because his motion to compel discovery was not ruled on. Defendant never asked that the motion be ruled on. It was not filed until Thursday before the trial began on Monday. Apparently the trial judge was not even aware of the motion until the discovery issue arose at trial. At that time defendant simply advised the court of its existence but did not ask the court to consider the motion. We concluded under similar circumstances in *State v. Jones*, 295 N.C. 345, 356-59, 245 S.E. 2d 711, 718-19 (1978), that defendants had "waived their statutory right to have the trial court order the prosecutor to permit discovery." *Id.* at 358, 245 S.E. 2d at 719. We so conclude in the instant case.

In summary we conclude that any failure of defendant to derive full benefit from our discovery statutes resulted from his own lack of diligence in pursuing the opportunities for voluntary

discovery which the state offered and in failing actively to pursue his later motion to compel discovery.

## II

[3] Defendant next challenges the admission over objection of SBI Agent Young's testimony regarding defendant's pre-trial, in-custody, incriminating statement. Defendant contends the state failed to demonstrate that he knowingly waived certain of his constitutional rights before making the statement and that he was mentally competent to make the statement. The latter contention is based essentially on the fact that defendant, before making his statement, had been given some form of medication. We find no merit in either contention.

"When the admissibility of an in-custody confession is challenged the trial judge must conduct a *voir dire* to determine whether the requirements of *Miranda* [*Miranda v. Arizona*, 384 U.S. 436 (1966)] have been met and whether the confession was in fact voluntarily made." *State v. Riddick*, 291 N.C. 399, 408, 230 S.E. 2d 506, 512 (1976). In determining whether a defendant is so under the influence of drugs as to render a confession inadmissible "the crucial fact [for inquiry on *voir dire*] is whether defendant knew what was being said and done" when his statement was made. *State v. Jackson*, 280 N.C. 563, 575, 187 S.E. 2d 27, 34 (1972). In *Jackson* the trial judge's finding after *voir dire* that defendant "was aware of the presence of officers . . . [and] that he knew and understood from what the officers told him what his constitutional rights were" was sufficient, when supported by competent evidence, to resolve the mental capacity issue against defendant.

Before admitting Agent Young's testimony, the trial court conducted a *voir dire* hearing to determine defendant's mental condition and whether his constitutional rights had been violated when he made the statement. The state's evidence tended to show as follows: Defendant, while under arrest in the intensive care unit of Pitt County Memorial Hospital, was fully apprised of his constitutional rights as per *Miranda*. When so advised he was fully coherent, sitting upright and cleaning his fingernails. He responded that he understood his rights, did not want a lawyer at that time, and would answer questions. No promises, threats, coercion, or hope of reward were made to secure a statement.

Defendant was not questioned immediately because his parents arrived and wished to talk with him and because medical personnel needed to prepare defendant for the trip to the Central Prison intensive care unit. Approximately one hour later, after defendant had been administered some form of medication, he was put on a stretcher and placed in an ambulance. Shortly thereafter in the ambulance defendant told Agent Young and Detective Schaeffer, who accompanied him, that he shot the deceased. Defendant "did not appear to be . . . under the influence of anything at that time and . . . appeared to know what was going on."

The trial court made findings, not excepted to by defendant, in accord with the above evidence. These findings were sufficient to support the trial court's conclusions that defendant before making his statement "freely, knowingly, intelligently and voluntarily" waived his constitutional rights to remain silent and to counsel and that his statement was "freely, voluntarily, and understandingly" made. The statement was, therefore, properly admitted. *See State v. Williams*, 289 N.C. 439, 222 S.E. 2d 242, *death sentence vacated*, 429 U.S. 809 (1976).

Further testimony given after the conclusion of the *voir dire* bolsters the findings and conclusions earlier made. This was that defendant, upon entering the ambulance, asked "if the other two fellows [Agent Young and Detective Schaeffer] were going to be riding with him." When told no, defendant stated his understanding that they were going to talk with him and reiterated his willingness to make a statement. Agent Young and Detective Schaeffer were then summoned and made the trip to Raleigh with defendant. Defendant made his incriminating statement during this trip.

III

[4] Defendant next argues in his brief twenty-four assignments of error relating to various evidentiary rulings and other actions of the trial judge. The thrust of defendant's brief is that the judge's actions indicate his general hostility to defendant and his counsel and, cumulatively, precluded defendant from receiving a fair trial. Specifically defendant complains, for example, that the trial judge in several instances failed to rule on defendant's objections with sufficient dispatch, addressed rulings on several defense motions to the jury, admitted opinion testimony, im-

properly admitted evidence before conducting a *voir dire*, permitted the prosecutor to make improper remarks to the court on *voir dire*, and occasionally asked defendant to state grounds for his objections but never made similar requests of the prosecutor. Defendant's brief barely touches on each incident and cites no authority to support his contention that any particular action was erroneous. He concedes, "Probably the most significant thing about the Judge's rulings . . . was not the ruling itself, but the manner in which it was done and the demonstrated hostile attitude both towards the defendant and his counsel . . . ."

We have carefully considered each action of the trial court with particular attention to defendant's contention that the court was hostile to the defense. We know, of course, that "the printed word does not capture the emphasis and the nuances that may be conveyed by tone of voice, inflection, or facial expression." *State v. Frazier*, 278 N.C. 458, 180 S.E. 2d 128 (1971). In *Frazier* we awarded defendant a new trial because a series of comments by the trial judge portrayed such "an antagonistic attitude" toward the defense that they breached "the cold neutrality of the law . . . to the prejudice of [the] defendant." *Id.* at 464, 180 S.E. 2d at 132. We recognized in *Frazier* that any one of the judge's comments, standing alone, "might not be regarded as prejudicial"; but when we viewed them cumulatively, we concluded the prejudicial effect was such as to entitle defendant to a new trial. In *Frazier*, however, we were faced with three gratuitous and unnecessary remarks of the trial court which tended to disparage the defense and, in one instance, indicated that defendants might have committed similar offenses at other times and places. In two other instances the trial court made perhaps unnecessarily sharp retorts first to a defense witness and second to defense counsel.

Nothing like the trial judge's comments in *Frazier* appear in this record. In each instance complained of here the court was responding to either an objection, motion or request on the part of counsel. The judge's statements, consequently, were not gratuitous. Neither were they, at least as they appear in writing, derisive, impolite, hostile, nor antagonistic. Defendant, for example, points to the following colloquies which, he says, demonstrate the trial court's hostile attitude: After the trial court had dictated its findings on the admissibility of defendant's out-of-court confession this colloquy occurred:

"MR. VOSBURGH: Your Honor, may I make a request for some further findings of fact for purposes of the record?

COURT: All right.

MR. VOSBURGH: Your Honor, the defendant would request that the Court finds as a fact that at the time this was done the defendant was in an intensive care unit at the Pitt County Memorial Hospital as a result . . . .

COURT: All right, put that in there.

MR. VOSBURGH: . . . of a gunshot wound . . . .

COURT: Well, all of it arises from this case.

MR. VOSBURGH: I understand that, your Honor.

COURT: Also put in the record that the self-in . . . well, the cause of his being in the Pitt Memorial Hospital was the result of a gunshot wound on the 9th day of October, and this was thirteen days later that the interrogation took place on the 22nd day of October, and that prior to that the defendant was in the process of being transferred from Pitt Memorial Hospital to Central Prison in Raleigh.

MR. VOSBURGH: Your Honor, I'd like to add that he was transferred from the Intensive Care Unit at the Pitt County Memorial Hospital to the Intensive Care Unit at Central Prison.

COURT: All right, put that . . . well, I don't know that.

VOSBURGH: Well, his mother testified that's where she visited him.

COURT: All right, well, put that in there as a finding of fact. Anything else?

MR. VOSBURGH: Yes sir, I'd like for you to find as a fact that because of his condition he was only permitted to receive visitors ten minutes at a time in the . . . .

COURT: I'm not going to put that in there because I don't know that. That might be just a rule of the hospital. They might let them in there any time.

MR. VOSBURGH: All right.

COURT: No, I'm not going to put that in there.

MR. VOSBURGH: Well, I can't get it in the record, your Honor, unless I request it.

COURT: All right. Call the jury back, Sheriff.

JURY RETURNED TO COURTROOM.

MR. VOSBURGH: Be sure to note my exception to that ruling.

EXCEPTION # 17."

When Mr. Vosburgh objected to the state's passing among the jury the record of defendant's conviction for trespass the following colloquy occurred:

"MR. VOSBURGH: I want to lodge an objection to that on the grounds that it is incompetent and it is an attempt to do by the District Attorney by indirection what he cannot do by direction.

COURT: No it isn't, no it isn't. All right, your objection is overruled.

EXCEPTION #42."

Finally, Mr. Vosburgh requested the court's permission to excuse the physicians. The record reveals the incident as follows:

"MR. VOSBURGH: Your Honor, if I may, may I ask someone from the Clerk's office to reproduce copies for purposes of the Court record of these documents so that they can be returned to Dr. Robbins and Dr. Williams and that they can leave.

COURT: I don't think I need the doctor, sure.

MR. VOSBURGH: I asked if these documents could be reproduced.

COURT: I've already told you to do that. I mean when you had the other one up there, I thought maybe you were going ahead and make copies so the man could go back to his duties.

MR. VOSBURGH: I'd like to note my exception for the records to the comments of the Court.

EXCEPTION #56.

COURT: About what?

MR. VOSBURGH: About the necessity of the doctor for you, your Honor.

COURT: He can be excused. All right, make a note of that in the record.

EXCEPTION #57."

There is simply nothing, so far as the printed word reveals, which indicates judicial hostility toward the defense. Nothing in the content of the statements could possibly have prejudiced defendant's case.

## IV

[5] Defendant next contends that the state should not have been permitted to offer evidence that sometime prior to the shooting the deceased's mother had ordered him off of her premises, where the deceased was residing, and that the incident resulted in defendant's being successfully prosecuted for trespassing on the deceased's mother's premises.

This evidence was admissible. "Where evidence tends to prove a motive on the part of the accused to commit the crime charged, it is admissible, even though it discloses the commission of another offense by the accused." *State v. McClain,* 240 N.C. 171, 81 S.E. 2d 364 (1954). *Accord, State v. Adcox,* 303 N.C. 133, 277 S.E. 2d 398 (1981). The state's theory is obviously that defendant shot the deceased because she rejected his love and attention. Much of the state's evidence was offered to prove this motive. This evidence consisted of defendant's statement to officers that the deceased "made him do it"; his statement to one of the state's witnesses that, "I love her and if I can't have her, I'm going to fix it where nobody can't"; and defendant's letter written from prison to the state's witness Wiggins from whom he obtained the shotgun. Evidence of defendant's trespass at deceased's mother's home, where deceased was then living, is simply further evidence of the fact that deceased had indeed rejected defendant before he

shot her. We note, further, that the offense of trespass is a minor misdemeanor. The conviction itself did not, in the jury's eyes, brand the defendant as a criminal so as to thereby reflect unfavorably on his character. The whole thrust of the evidence was to show the broken relationship between defendant and deceased. For this purpose it was highly relevant. Its relevance, consequently, far outweighed the negligibly disparaging fact of the conviction itself. Its admissibility is strongly supported by *State v. Patterson*, 288 N.C. 553, 220 S.E. 2d 600 (1975), *death sentence vacated*, 428 U.S. 904 (1976); *State v. Moore*, 275 N.C. 198, 166 S.E. 2d 652 (1969); *State v. Adams*, 245 N.C. 344, 95 S.E. 2d 902 (1957); *State v. Birchfield*, 235 N.C. 410, 70 S.E. 2d 5 (1952); *State v. Ray*, 212 N.C. 725, 194 S.E. 482 (1938).

V

[6] Defendant assigns as error the trial court's refusal to give his requested instruction that evidence of defendant's mental disorders, while not sufficient to establish legal insanity, may be considered on the question of whether he had the capacity to deliberate or premeditate at the time the homicide was committed. Defendant contends that his mental disorders prevented him from forming the specific intent to kill which is required for a conviction of first degree murder by premeditation or deliberation. This Court has consistently rejected this kind of defense to first degree murder. *See State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980); *State v. Harris*, 290 N.C. 718, 228 S.E. 2d 424 (1976); *State v. Hammonds*, 290 N.C. 1, 224 S.E. 2d 595 (1976); *State v. Shepperd*, 288 N.C. 346, 218 S.E. 2d 176 (1975); *State v. Wetmore*, 287 N.C. 344, 215 S.E. 2d 51 (1975), *death sentence vacated*, 428 U.S. 905 (1976); *State v. Cooper*, 286 N.C. 549, 213 S.E. 2d 305 (1975). This assignment of error is overruled.

VI

Defendant, without citation of authority, assigns as error several portions of the trial court's final charge to the jury. We have carefully examined each of the challenged instructions and find them all to be without merit. Lengthy repetition of well-settled principles of law in refutation of frivolous contentions would serve no useful purpose. Suffice it to say the trial court provided an accurate summation of the facts and the law ap-

plicable thereto. Thus we overrule without discussion these assignments.

## VII

[7] Defendant assigns as error the following instruction:

> "In the event that the defendant is convicted of murder in the first degree, the Court will conduct a separate hearing or separate sentencing hearing, to determine whether the defendant should be sentenced to death or life imprisonment. This proceeding may be conducted before you or another jury. It will be conducted, if necessary, as soon as practical after your . . . after any verdict of guilty of first degree murder is returned. If that time comes, you will receive separate sentencing instructions. However, at this time, your only concern is to determine whether the defendant is guilty of the crime charged, or any lesser included offense, about which you are instructed."

Defendant contends this instruction is inadequate since it fails to inform the jury of the possible punishments under a finding of guilty of murder in the second degree.

We disagree. The judge should not ordinarily instruct the jury with regard to possible punishments for lesser included offenses of the capital crime for which defendant is being tried, at least when punishment for such offenses is not mandatory but subject to the exercise of the judge's discretion. *State v. Rhodes*, 275 N.C. 584, 169 S.E. 2d 846 (1969). In cases where the jury's verdict will result in a mandatory sentence the judge may or may not, in his discretion, so advise the jury. *State v. Potter*, 295 N.C. 126, 244 S.E. 2d 397 (1978) (no error when such advice was given); *State v. Wilson*, 293 N.C. 47, 235 S.E. 2d 219 (1977) (no error when such advice was not given). *See also State v. Jolly*, 297 N.C. 121, 254 S.E. 2d 1 (1979) where we held advice as to punishment where armed robbery (involving punishment in the judge's discretion, G.S. 14-87) and first degree burglary charges were jointly tried and jointly submitted "may be given or withheld in the court's discretion . . . ." If, however, "in a capital case if the jury appears to be confused or uncertain [regarding the consequences of possible verdicts], the trial judge should act to alleviate such uncertainty or confusion." *State v. Britt*, 285 N.C. 256, 272, 204 S.E. 2d 817, 828 (1974).

State v. Anderson

We find neither error nor abuse of discretion in the trial judge's not instructing here on the range of punishment available in the event of a second degree murder conviction. Punishment in such event would have been a matter within the trial court's discretion. It would not have been a matter for the jury's consideration. The jury did not appear to be confused or uncertain regarding the consequences of its verdict.

Since, however, the jury must ultimately determine punishment upon a first degree murder conviction, G.S. 15A-2000, it was proper, if not required, for the trial judge to so inform it at the guilt determination stage. *See* G.S. 15-176.4; *see also State v. McMorris*, 290 N.C. 286, 225 S.E. 2d 553 (1976).

## VIII

[8] Defendant finally contends, as we understand his argument, that his constitutional right to a jury selected from a fair cross-section of the community is violated when the prosecutor in a capital case is allowed to inquire into a prospective juror's views as to capital punishment and when all those finally seated are committed to being able to impose the death penalty. A majority of this Court, after full consideration, rejected such an argument in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980). It is rejected here.

We find, therefore, in defendant's trial

No error.

Justice MEYER did not participate in the consideration and decision of this case.