STATE OF NORTH CAROLINA v. JOHN THOMAS NOLAND, JR.

No. 1A83

(Filed 2 October 1984)

1. **Criminal Law § 135.3; Constitutional Law § 63; Jury § 7.11— exclusion of veniremen opposed to capital punishment—proper**

North Carolina's jury selection process is constitutional and the trial court did not err by death-qualifying the jury.

2. **Constitutional Law § 80; Criminal Law § 135.1— constitutionality of death penalty—discretion of district attorney to seek death penalty**

The defendant failed to prove that the exercise of prosecutorial discretion undermines the constitutionality of the death penalty statute, G.S. 15A-2000, since he did not show that the prosecutor employed an arbitrary standard in selecting which cases to try as capital cases.

3. **Criminal Law § 106; Burglary § 5.9— breaking and entering and assault—sufficiency of the evidence**

The State presented sufficient evidence of first-degree burglary, and defendant's motion to dismiss the charge was properly denied, where the evidence showed that an occupant of the house went to the back door in response to a knock on the window; there was no evidence that the victim invited defendant inside; witnesses heard a bang and saw the victim running into the house screaming; the glass pane in the door was broken; and that defendant followed the victim into the house, cornered her, and shot her.

4. **Criminal Law § 102.1— prosecutor reading the law to the jury—proper**

The State was within the bounds of proper argument in reading the law on amnesia to the jury since the issue was relevant and fairly presented by the evidence; furthermore, the prosecutor's "misquoting" of the law did not constitute an impropriety so extreme as to require the trial judge to act *ex mero motu*.

1

State v. Noland

5. **Criminal Law §§ 114, 120.1— first-degree murder—instruction to the jury to determine guilt or innocence, not punishment—proper**

   A jury instruction which may have been requested by defendant, which was quoted almost verbatim from the Pattern Jury Instruction on first-degree murder, and which simply explained to the jury that their duty was to determine only the guilt or innocence of the defendant and not the punishment, did not suggest to the jury that a finding of guilty of first-degree murder was appropriate, nor did it intimate to the jury that the trial judge believed defendant was guilty.

6. **Criminal Law §§ 102.12, 135.8— first-degree murder—sentencing—prosecutor's argument—aggravating factor**

   The trial court did not err in failing to act *ex mero motu* to take curative action when a prosecutor emphasized to the jury the seriousness of an aggravating factor, particularly when defense counsel had earlier attempted to diminish the seriousness of the aggravating factor.

7. **Criminal Law §§ 135.8, 109.1— first-degree murder—sentencing—mitigating factor—peremptory instruction not required**

   The district attorney did not act improperly in indicating to the jury that it could determine the existence of the mitigating factor consisting of lack of any prior criminal activity, and the trial judge did not err by failing to give a peremptory instruction that defendant had no significant history of prior criminal activity, when there was evidence that defendant had communicated threats and had been convicted of that charge, that he had communicated threats on several other occasions, and that he had at least once committed assault on a female.

8. **Criminal Law § 102.12— first-degree murder—prosecutor's argument—death penalty a deterrent**

   The prosecutor's argument that the imposition of a sentence of death would be a deterrent to future dangerous activity by defendant was not improper.

9. **Criminal Law § 135.4— first-degree murder—sentencing issues**

   In a first-degree murder sentencing proceeding, the issues as framed by the trial court were constitutionally valid and free of prejudicial error.

10. **Criminal Law § 135.9— first-degree murder—mitigating circumstance—burden of persuasion**

    The burden of persuasion as to the existence of mitigating circumstances is on the defendant.

11. **Criminal Law § 135.9— first-degree murder—mitigating circumstance—peremptory instruction not required**

    The trial court was not required to give a peremptory instruction on the mitigating circumstance that "the capital felony was committed while defendant was under the influence of mental or emotional disturbance" because the evidence was conflicting. A peremptory instruction is proper only when *all* the evidence, if believed, tends to show that a particular mitigating factor exists.

**12. Criminal Law § 135.9— first-degree murder — mitigating circumstance — jury not required to list mitigating factors**

   The trial court did not err by not requiring the jury to list each mitigating factor it found on the issue sheet, although the better practice is to require the jury to specify mitigating factors found and not found to facilitate appellate review.

**13. Criminal Law § 135.4— first-degree murder — sentencing — unanimity required in determination of mitigating factors**

   The trial court did not err by instructing the jury that it was required to reach a unanimous decision in its determination of mitigating factors.

**14. Criminal Law § 135.4— first-degree murder — finding in aggravation supported by the record — no impermissible influence in sentencing**

   The jury's finding in aggravation was fully supported by the record, and the death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

**15. Criminal Law § 135.4— first-degree murder — death sentence not disproportionate**

   The death sentence imposed was neither excessive nor disproportionate to the penalty imposed in similar cases considering both the crime and the defendant.

   Justice EXUM dissenting as to sentence.

   Justices MARTIN and FRYE join part II of this dissent.

ON appeal by defendant as a matter of right from the judgments of *Gaines, Judge,* entered at the 25 October 1982 Criminal Session of Superior Court, MECKLENBURG County. In bills of indictment, proper in form, defendant was charged with first degree murder of Cynthia Jean Milton, with first degree murder of Troy C. Milton, with first degree burglary of the home of Cynthia Milton, with first degree burglary of the home of Troy C. and Mary N. Milton, and with assault with a deadly weapon upon Mary N. Milton with intent to kill, inflicting serious injury. The jury returned verdicts of guilty on all five charges and recommended the sentence of death in both murder cases. Judge Gaines ordered the imposition of the death penalty for each murder conviction, and imposed consecutive life sentences for each burglary conviction and a consecutive twenty year sentence for the assault conviction. On 22 November 1983 we granted the defendant's motion to bypass the Court of Appeals on the assault conviction.

In relevant part, the State's evidence tended to show the following: The defendant John Thomas Noland, Jr. was married to Susan Milton Noland, hereinafter referred to as Susan Milton, for nine years and nine months prior to their separation on 3 March 1981. For the last eight years of their marriage the couple resided at 4144 S. Tryon Street in Charlotte, North Carolina, next to Susan's parents, Mary and Troy Milton. The defendant and Susan had two daughters, Missy and Christy, who were ages nine and six respectively at the time of trial.

Susan Milton testified at trial that she and the defendant were married when she was eighteen years old. They separated for a short period within the first year of their marriage, and again when their oldest daughter was ten months old. Throughout their marriage John had difficulty retaining permanent employment for extended periods of time. The couple's final separation was induced in part by John's striking Susan in March of 1981. At that time Susan and the children moved into an apartment with Susan's sister, Cynthia Milton, hereinafter referred to as Cindy Milton. Three weeks later Susan and the children returned to the Tryon Street home after John eventually moved out. During the ensuing period of separation, John visited Susan and their daughters at least once a week and talked on the telephone with them frequently. Initially John constantly begged Susan to return to him. Then, he began to make threats regarding their property. Finally, in an effort to find peace, Susan moved with the children to California in June 1981. There they lived with Susan's older sister, Dorothy Milton Gardalcic. Susan informed John by letter where she and the children were living. For the next several months there was ongoing telephone contact between Susan and the children, and John. After approximately four months, Susan and her children moved from her sister's house into a separate home, but did not give John the address or telephone number. They maintained contact with him through her sister's telephone.

Every time Susan and John talked on the telephone, he asked her when she was coming back to Charlotte. She always replied that she did not know. In November 1981, John began making threats against Susan's family. He told both Susan and her sister Dorothy that he would kill their father, mother and sister Cindy if Susan didn't return to Charlotte with the children before Christmas. He said, "I'm going to kill Cindy first because

State v. Noland

she means more to [Susan] than anything. I'm going to kill your daddy and make your momma watch." John further informed Susan that he would place a "gun between [her] daddy's eyes and blow his head off." Susan and the children did not return to Charlotte.

On Friday, 5 February 1982, John telephoned Susan and gave her another ultimatum. He told her she had two weeks to come back to Charlotte and that, if she did not, he would kill her family. The following day John called and told Susan that he was not giving her two weeks or any more time. He demanded her decision immediately. When she answered that she did not want to take the children out of school, he responded, "Well, you will come back; you'll have to come back, because I am going to kill your family."

About two weeks later on Saturday, 20 February 1982, John called Susan again. He inquired as to whether she was coming back, to which she replied, "Not now." He then told Susan, with regard to his plans for her family, "I know how I'm going to do it and when I'm going to do it, but, I'm not going to tell you when." Prior to this conversation, John had informed Susan that he had a .44 magnum in the trunk of his car, which was waiting for her when she returned. After the 20 February 1982 telephone conversation with John, Susan called her mother Mary Milton, as she always did after John made threats against her family, to warn her about John's latest threat. The following day at approximately 7:00 p.m. Charlotte time, Susan telephoned her sister Cindy and warned her to be very careful because of the defendant's latest threat.

At around 9:00 p.m. on Sunday, 21 February 1982, Cindy Milton and her two friends, Roger Campbell and Jody Renhold, were watching television in the living room of her home at 4144 S. Tryon Street in Charlotte, North Carolina. This house was the same one that previously had been occupied by Cindy's sister Susan Milton and the defendant. Upon hearing a knock on the living room window, Cindy went to the back door to investigate. The next sound Renhold and Campbell heard was a loud bang followed by Cindy's screams as she rushed into the house. With her hands covering her face, she cried, "Oh God, no," and ran into the laundry room adjacent to the kitchen. A man, later identified by

Renhold and Campbell as the defendant, John Thomas Noland, Jr., followed Cindy into the house yelling, "I told you not to get involved." He followed her into the laundry room, took aim, and shot Cindy in the back of the head as she huddled helplessly behind the laundry room door. The defendant turned and entered the living room. Renhold and Campbell stood facing the defendant for a few seconds before scrambling for cover in other parts of the house. The assailant departed, leaving the two witnesses unharmed.

Directly across a vacant lot from Cindy Milton's house, at 418 West Peterson Drive, lived Cindy's parents, Mary and Troy Milton. At approximately 9:00 p.m. on the day in question, Mary Milton was in her living room writing a letter, while her husband was in the back bedroom asleep. Mary Milton heard what sounded like a gunshot and walked into the front bedroom to peer out the window in the direction of her daughter Cindy's house. While Mrs. Milton was still in the bedroom, she turned to find a man whom she recognized and later identified as the defendant, standing in the hallway of her home. Upon seeing the defendant with a gun in his hand, Mary Milton screamed and slammed her door shut. She heard a gunshot coming from the room in which her husband was sleeping. Then, as the defendant pushed her door open, he told Mary Milton, "I told you I was going to kill all three of you. And, I've already killed Cindy and your old man. I'm going to get you." The defendant shot at Mrs. Milton. She picked up a nearby bar stool and lunged at the defendant. He fired again, this time wounding Mary Milton who fell to the floor, rolled toward the bed and remained very still. The defendant turned and walked out of the house. Mrs. Milton immediately telephoned Cindy's house, and discovered from Roger Campbell that Cindy had been shot. She called the Charlotte City Police Department.

Charlotte law enforcement officers J. L. Hughes and J. P. Albini arrived at the Milton home simultaneously. Mary Milton met them at the door. Her bathrobe was shredded and her right front midsection bore extensive gun powder burns. She informed the officers that her husband and daughter had been shot. Officer Hughes entered the Milton home and found Troy Milton lying in his bed dead. The forensic pathologist Dr. Hobart Wood later determined that the cause of Mr. Milton's death was a' massive

gunshot wound of the head, with entry through the left eye and face.

While Officer Hughes investigated the Milton home, Officer Albini proceeded to Cindy Milton's house located on the corner. He found Jody Renhold and Roger Campbell standing outside the house, clutching each other and screaming hysterically. As the officer entered the back door, he noticed that the glass from the top portion of the door had been shattered and lay in pieces on the steps. Once inside he observed a large amount of blood and tissue on the floor which appeared to be seeping from the laundry room. Officer Albini looked behind the partially closed laundry room door and discovered Cindy Milton's body, in a kneeling position facing the wall. Dr. Wood testified that Cindy's death resulted from a massive gunshot wound to the head, with the point of entry in the back right occipital area of the head and measuring six inches in diameter.

Before being taken to the hospital, Mary Milton informed Officer Hughes that the assailant was her ex-son-in-law John Noland, Jr. She gave the officer a physical description of the defendant as well as a description of his automobile. Renhold and Campbell gave a similar physical description and further told Officer Albini that they believed the gunman was Cindy Milton's ex-brother-in-law.

Within an hour after the shootings, the Charlotte City Police received a call to investigate a suspicious vehicle parked in front of a residence on Beam Road. As Sergeant J. R. Haston approached the Beam Road residence, he observed a car parked crossways in the driveway. The car fit the description of defendant's car given by Mary Milton. The officer stopped his vehicle about 25 yards away from the parked car, drew his revolver and told the driver, who was still sitting in the car, to put his hands out the window. The driver complied and, in response to Sergeant Haston's request for his name, the driver stated, "John Noland. You got me man."

The sergeant handcuffed the defendant, placed him in the back of the police car and read him the *Miranda* rights. Soon thereafter, Mecklenburg County and Charlotte City law enforcement officers arrived. The defendant was transported to the Charlotte Law Enforcement Center.

Mrs. Patsy Norment, who resided at the Beam Road house in front of which defendant had parked his car, informed the officers that at one time she observed the defendant get out of his car. Thus, a search of the surrounding area was conducted. In the grass approximately 12 feet in front of defendant's car, the officers discovered a Sturm Ruger 6 shot single action revolver chambered for a .44 magnum cartridge. A shell casing was found on the front seat of the car. Two empty shell casings were discovered by Mrs. Norment the following day and were turned over to the police. A holster and a box of ammunition were eventually discovered in the trunk of the car.

An examination of the gun by Roger Thompson of the Charlotte-Mecklenburg Crime Laboratory revealed that the cylinder contained two live .44 caliber cartridges and one discharged .44 cartridge. In Mr. Thomas's expert opinion the gun found near the defendant's car was the weapon that fired the projectile removed from the body of Troy Milton. Mr. Thomas also testified that he examined the clothing worn by Mary Milton at the time she was wounded, and determined that Mrs. Milton's bathrobe exhibited two areas of gunshot damage. The left side of the robe exhibited characteristics of a firearm being held parallel to the garment with the muzzle in contact with it when it was discharged. The area of damage on the mid-right abdominal area of the garment exhibited powder and residue characteristics consistent with a firearm held at a distance greater than contact but less than 6 inches.

At the Charlotte Law Enforcement Center, the defendant was advised of his *Miranda* rights by Officer C. E. Boothe, a homicide investigator. Defendant acknowledged that he understood his rights and requested the presence of an attorney during any further questioning by the officers. Officer Boothe testified that later that night the defendant stated, without any prompting or questioning from the officers, "Man I just killed two people, man. Why are you being so nice to me?"

Through various witnesses the defendant offered evidence of his mental and emotional condition at the time prior to and during the shooting incidents. The defendant's parents testified that the defendant became very depressed and nervous subsequent to his separation from his wife. He frequently cried or sat inside the

house staring vacantly. Defendant began receiving treatment in April 1981 at the Mecklenburg County Mental Health Center, first as an outpatient. In May 1981 he was voluntarily hospitalized and treated as an inpatient for about a week. During that hospitalization, the initial diagnosis was depressive neurosis. One week after his discharge from the Mental Health Hospital, defendant's father committed him with an involuntary commitment petition. An attending psychiatrist, Dr. John Humphrey, found the defendant to be mentally ill and made a tentative diagnosis of borderline personality with recurring thoughts of suicide and homicide. In late May 1981 defendant's condition showed little improvement. Thus, he was involuntarily committed to the Mecklenburg Mental Health Hospital by Chief Judge Chase Saunders of Mecklenburg County District Court for a period not to exceed 90 days. On 10 June 1981 the defendant was unconditionally discharged from the hospital.

Dr. Billy W. Royal, a forensic psychiatrist at Dorothea Dix Hospital in Raleigh, North Carolina, examined the defendant subsequent to his arrest and diagnosed the defendant's condition as a dysthymic disorder, which is also known as depressive neurosis. Personality tests administered by Dr. Royal revealed evidence of depression, insecurity, anxiety, and low self-esteem. According to Dr. Royal, the defendant's personality structure and past history created an instability which made it impossible for the defendant to deal with the loss of his wife and children.

With regard to the incidents of 21 February 1982, Dr. Royal noted that the defendant John Noland was in a condition of continued distress, which had recently been heightened by the defendant's conclusion that his hope of reconciliation with his wife and children would not be fulfilled. He became increasingly disturbed and obsessive. Dr. Royal learned from the defendant that on the evening of 21 February 1982 the defendant was driving his car and passed by the house that he and his family had shared at 4144 South Tryon Street. At that time, the defendant's attention riveted on a swing set in the backyard. According to the defendant, he drove up and down the road in an obsessional trance. John Noland told Dr. Royal that he went to the door of the house, saw movement in the house and had no recollection of the events after that. Later, he found himself out in the car. He felt strange and different, and realized he had a hot gun in his

hand. He became anxious and threw the gun away. The next thing the defendant remembered was the police talking to him.

Dr. Royal testified, with respect to John Noland's lack of recollection of the killings, that amnesia based upon psychiatric or psychological causes can occur when a person experiences a conflict of emotions. Such conflict involves activities which the normal consciousness views as an unacceptable impulse or feeling. "And we may have a period of time either with or without activity that would be blocked out because we can't deal with [the fact that we have succumbed to that unacceptable behavior.]" The doctor further testified that he had no opinion on the sanity of John Thomas Noland, Jr. at the time of the offenses because, with the reported amnesia, he had no basis for knowing whether John Noland was psychotic. He testified, however, that there was "a suggestion that he may not have known the difference" between right and wrong.

At the end of all the evidence the jury found the defendant guilty of two counts of first degree murder, two counts of burglary in the first degree, and assault with a deadly weapon with the intent to kill inflicting serious injury. Judge Gaines imposed consecutive life sentences for each burglary conviction and a consecutive twenty year sentence for the assault conviction. The defendant and the State relied on the evidence presented during the guilt determination of the trial and did not present any additional evidence at the sentencing hearing.

In its instructions during the sentencing hearing in each first degree murder case, the court submitted one aggravating circumstance for the jury's consideration: the murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons. N.C. Gen. Stat. § 15A-2000(e)(11). The court also submitted to the jury sixteen mitigating circumstances, including three statutory mitigating circumstances. The jury found at least one or more mitigating circumstances, without indicating which mitigating circumstance they found, and that one aggravating circumstance existed. In each case the jury unanimously found that the mitigating factors were outweighed by the aggravating factors beyond a reasonable doubt. Therefore, the jury recommended

the imposition of the death penalty for both murders, and it was so ordered.

Additional facts relevant to the defendant's specific assignments of error will be incorporated into the opinion.

*Rufus L. Edmisten, Attorney General, by Joan H. Byers, Assistant Attorney General, for the State.*

*Grant Smithson and Jean B. Lawson, for the defendant appellant.*

COPELAND, Justice.

Defendant brings forward numerous assignments of error[1] relating to the guilt determination phase of his trial and to the sentencing phase of his trial. After a careful consideration of these assignments, as well as the record before us, we find no error in any of these proceedings and affirm the judgments.

## GUILT PHASE

### I.

[1]  Defendant contends that prior to the guilt-innocence phase of the trial, the trial court erred in "death-qualifying" the jury because a "death-qualified" jury is allegedly prosecution prone, i.e., more likely to convict a defendant, and thus is constitutionally unacceptable. This Court has repeatedly held that North Carolina's jury selection process in first degree murder cases is constitutional. *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197 (1984). This assignment of error is overruled.

---

1. Defendant's brief contains twenty-four assignments of error, four of which defendant acknowledged in his index as abandoned. Upon reading the brief we discovered, via inserted indications, that defendant had abandoned five additional assignments of error. We assume that defendant also abandoned two other assignments, specifically XV and XVI, since we cannot locate these numbered assignments anywhere in his brief.

The defendant further complicated our duty of addressing his assignments by addressing certain assignments out of numerical sequence and by giving in the index incorrect corresponding page numbers for some of the assignments. Such discrepancies and errors result in confusion and an inefficient use of Court time.

## II.

[2] Defendant next assigns as error the trial court's denial of his pretrial motion to bar the imposition of the death penalty on the basis that the prosecutorial discretion to seek or not to seek the death penalty violates the defendant's right to due process.[2] The defendant contends that the death penalty was unconstitutionally applied in the case *sub judice* due to the prosecutor's exercise of discretion in determining that his case would be tried as a capital case. The defendant relies on two cases, which arguably could have factors in aggravation, in which the prosecutor in the same judicial district in which the defendant was tried permitted the defendants to plead guilty to second degree murder. *State v. Coy Devore* (81CRS12679, Mecklenburg County) and *State v. Larry Wilson* (82CRS17018, Mecklenburg County).

Under the legal system of this State, the prosecutor has the authority and duty to use his best judgment in deciding which cases to pursue and which penalties to seek. Unless defendants show that the prosecutor's selectivity is systematically based on race, religion or some other arbitrary classification, *Oyler v. Boles*, 368 U.S. 448, 7 L.Ed. 2d 446 (1962), the fact that one case possesses a strong fact situation which would justify seeking the death penalty, while another case does not, does not constitute a constitutional violation.

The United States Supreme Court, in *Gregg v. Georgia*, 428 U.S. 153, 49 L.Ed. 2d 859 (1976) and *Proffitt v. Florida*, 428 U.S. 242, 49 L.Ed. 2d 913 (1976), rejected the argument that prosecutorial discretion invalidated the death penalty statutes because it allowed impermissible discretion. The fact that discretionary stages in the legal process exist, does not, by itself, show that the death penalty is capriciously imposed. The arbitrary and capricious imposition of the death penalty with which we are concerned occurs only when the punishing authority operates without any guidance.

---

2. Although defendant brought this motion prior to the empaneling of the jury, the trial court declined to rule on this motion until the close of the guilt-innocence phase. At that time, the trial judge denied defendant's motion, but agreed to allow the defendant to present evidence in support of the motion at the end of the sentencing phase of the trial.

Thus, since the defendant has not shown that the prosecutor employed an arbitrary standard in selecting which cases are tried as capital cases, he has failed to prove that the exercise of prosecutorial discretion in any way undermines the constitutionality of our death penalty statute, N.C. Gen. Stat. § 15A-2000. This assignment is without merit.

## III.

[3] The defendant contends that the trial court erred by failing to dismiss the charge of first degree burglary at the home of Cynthia Milton. At the close of the State's evidence, defendant moved to dismiss on the above charge. The trial court denied the motion. Defense counsel renewed the motion at the end of all the evidence, and the trial court again denied the motion. Although the defendant's counsel on appeal excepts only to the denial of the motion made at the close of the State's evidence, instead of on the denial of the motion made at the close of all the evidence as mandated by N.C. Gen. Stat. § 15-173, we shall nevertheless review the merits of this assignment of error. *State v. Leonard*, 300 N.C. 223, 266 S.E. 2d 631 (1980).

First degree burglary is the breaking and entering during the nighttime of an occupied dwelling with the intent to commit a felony therein. *State v. Simpson*, 299 N.C. 377, 261 S.E. 2d 661 (1980). The defendant contends that the evidence was not sufficient to support the element of a breaking, either actual or constructive. The defendant does not question the sufficiency of the evidence with regard to the remaining elements of first degree burglary. A breaking, as it pertains to the crime of burglary, "constitutes any act of force, however slight, 'employed to effect an entrance through any usual or unusual place of ingress, whether open, partly open, or closed.'" *State v. Jolly*, 297 N.C. 121, 127-128, 254 S.E. 2d 1, 5-6 (1979); *see State v. Myrick*, 306 N.C. 110, 291 S.E. 2d 577 (1982).

The evidence reveals that Cindy Milton walked to her back door in response to a knock on the window. There was no evidence that the victim invited the defendant inside. The witnesses testified that they heard a bang and saw Cindy running into the house, screaming. The glass pane in the back door was broken. The defendant followed Cindy into the house, cornered her in the laundry room, and shot her. There was substantial evidence from

which the jury could infer that defendant entered the house with force and without consent.

When given the benefit of the reasonable inferences drawn from this evidence, we believe the State presented sufficient evidence of a breaking, as well as the other elements of first degree burglary. Thus, the defendant's motion to dismiss the charge of first degree burglary was properly denied.

## IV.

[4] In his next assignment of error, defendant argues that the district attorney during closing arguments improperly and prejudicially read to the jury the law concerning "amnesia" found in *State v. Caddell*, 287 N.C. 266, 215 S.E. 2d 348 (1975). Defendant claims that this reading denigrated and downplayed his defense of insanity, by convincing the jury to totally disregard the evidence in support of his defense of not guilty by reason of insanity. We find this assignment of error meritless.

During closing argument in the guilt-innocence stage, the prosecutor read the following to the jury:

Amnesia is rare. More frequently the accused, remembering full well what he's done, alleges amnesia in false defense. He is a malingerer . . . Failure to remember later, when accused, is in itself no proof of the mental condition when the crime was performed.

The precise language on amnesia in *Caddell* appears as follows:

"Amnesia, loss of memory, may lead to crimes entirely unknown to the culprit at a later date. That is rare. More frequently, the accused, remembering full well what he has done, alleges amnesia in false defense. He is a malingerer. To prove his innocence or guilt may be most difficult . . . Failure to remember later, when accused, is in itself no proof of the mental condition when crime was performed."

*Id.* at 286, 215 S.E. 2d at 361.

The defendant did not object to the remarks of which he now complains. Ordinarily, defense counsel must object to the prosecuting attorney's jury argument prior to the verdict in order to avoid waiving the alleged error for appellate review. *State v.*

*Brock*, 305 N.C. 532, 290 S.E. 2d 566 (1982). In *Brock*, however, we noted that:

> An exception to this rule is found in capital cases where, because of the severity of the death sentence, this court will review alleged improprieties in the prosecutor's jury argument despite defendant's failure to timely object. *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). However, even in death cases the impropriety must be extreme for this court to find that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel failed to find prejudicial when he heard it.

*Id.* at 537, 290 S.E. 2d at 570.

In the case *sub judice* the evidence revealed that the defendant claimed amnesia about the shootings. Yet, according to the testimony of certain law enforcement officers, shortly after the killings the defendant made comments which indicated that he was well aware of his criminal actions. The examining psychiatrist was unable to form an opinion as to Noland's ability to know the difference between right and wrong due to the claimed amnesia; nor was the doctor able to determine whether the amnesia was in all actuality real.

The crux of the defendant's complaint is that because his defense to the murder charges was insanity, the reading of the quoted material was irrelevant to the issues before the jury. We disagree. The defendant introduced evidence at trial concerning his alleged "amnesia." By so doing, the issue of amnesia became relevant, particularly in terms of its possible fabrication and its effect on the underlying insanity defense. Defendant concedes that the well established law in North Carolina allows counsel the right to argue to the jury the law and the facts in evidence and all reasonable inferences to be drawn therefrom. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056 (1982), *reh. denied*, 459 U.S. 1189 (1983).

We believe the State was well within the bounds of proper argument in reading the law on amnesia to the jury since the issue was relevant and fairly presented by the evidence. Furthermore, the prosecutor's "misquoting" of *Caddell* did not constitute

State v. Noland

an impropriety so extreme as to require the trial judge to act *ex mero motu*. The assignment of error is overruled.

## V.

[5] The trial judge, in his instructions to the jury during the guilt-innocence phase, informed the jury that it might possibly serve as the triers of fact in the sentencing phase. The judge instructed as follows:

> Now, Members of the jury, *in the event* that the defendant in this case is convicted of murder in the first degree, I instruct you that the Court will conduct a sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. This proceeding may be conducted before you or another jury. It will be conducted, *if necessary*, as soon as practical after any verdict of guilty of first degree murder is returned. (Emphasis added.)

Defendant asserts that this "instruction constituted an improper expression of opinion by the [c]ourt on the evidence," since the trial judge, in essence, told the jury that the evidence presented warranted verdicts of guilty. Although the defendant now maintains that this instruction violated N.C. Gen. Stat. § 1-180 (repealed in 1977 and replaced by N.C. Gen. Stat. § 15A-1232), and caused irreparable prejudice, he failed to object at trial. In fact, the record seems to indicate that the instruction was requested by the defendant since, according to N.C.P.I.—Crim. 206.10 (Replacement May 1980), the court shall give this instruction upon request by a party. The transcript discloses the following subsequent to the reading of the instruction in question:

> THE COURT: Mr. Mercer, is that the instruction now that you wanted?
>
> MR. MERCER: Yes, sir.
>
> THE COURT: All right.

Furthermore, following the above portion of the jury instructions, the trial judge also informed the jurors that:

> If that time comes, you will receive separate sentencing instructions. However, at this time, your only concern is to determine whether the guilty [sic] of the defendant—whether

the defendant is guilty of the crimes charged; or, any lesser included offenses, about which you were instructed.

The instruction, quoted almost verbatim from the Pattern Jury Instruction on first degree murder, N.C.P.I.—Crim. 206.10 (Replacement May 1980), simply explains to the jury that their duty at this stage is to determine only the guilt or innocence of the defendant, and not the punishment. We do not believe that the instruction suggested to the jury that a finding of guilty of first degree murder was appropriate nor do we find that it intimates to the jury that the trial judge believed the defendant was guilty. The trial judge was merely explaining the legal process to the jurors, as it pertained to their duty. Accordingly, we reject defendant's contention and hold that the instruction was properly given.

### SENTENCING PHASE

### VI.

[6] In his next assignment of error, defendant contends that the district attorney in his argument to the jury improperly elevated the statutory aggravating factor N.C. Gen. Stat. § 15A-2000(e)(11). This aggravating circumstance provides that:

> (11) The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons.

The district attorney argued in detail to the jury the legal importance of the mitigating factors and the single submitted statutory aggravating factor. The portion of his argument in question is as follows:

> The second question, "Does the aggravating factor warrant the death penalty"?

> As I've told you, under the statutory scheme, it's not necessary for the State to have more than one aggravating factor in order to be able to request the jury to return a verdict of the death penalty. The presence of any one or more of those aggravating factors, if in your mind, if you decide it is

serious enough to warrant the imposition of the death penalty, is sufficient for you to find that.

I would argue to you that this aggravating factor is perhaps the most serious of any of them. And, I would argue to you that the fact that this man killed two people and tried to kill another, seriously wounding her, is sufficiently serious to warrant the imposition of the death penalty. I don't know of any other case—I can't imagine any other case that can be more serious. And, I would argue to you that the answer to that question is, "Yes."

Defendant argues that the district attorney improperly injected his personal beliefs concerning the applicable law, by asserting his opinion that greater weight should be given to this factor in aggravation. Defendant lodged no objection during this portion of the prosecutor's argument. Because we do not believe that these remarks constituted error, the trial judge correctly refrained from taking curative action *ex mero motu.*

Prosecutors may not misstate the law or inject personal opinion concerning a legal principle. *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197. N.C. Gen. Stat. § 15A-2000 does not apportion or assign any particular weight to be afforded the listed mitigating and aggravating factors for the sentencer's consideration. The law assigns no particular value or weight to any of the factors for the jury's consideration. *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* --- U.S. ---, 78 L.Ed. 2d 173 (1983).

Although the capital sentencing statute does not assign the relative value to be given to each circumstance, certainly attorneys should be allowed to discuss the merits of each of the factors presented and their seriousness or lack thereof. *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983) (jury argument regarding weight to be given mitigating factors); *see State v. Craig,* 308 N.C. 446, 302 S.E. 2d 740, *cert. denied,* --- U.S. ---, 78 L.Ed. 2d 247 (1983). Here, defense counsel in his jury argument emphasized to the jury that out of eleven statutory aggravating factors the evidence supported only one. He further attempted, as the law permits him, to diminish the seriousness of that one aggravating factor. The district attorney responded to what he called the defense counsel's indication that "the State intend[ed] to rely on . . . a technical [aggravating factor]," and attempted to

bolster the aggravating factor. We perceive the prosecutor's statement, "I would argue to you," not as an injection of personal opinion but as a contention to be considered by the jury. We hold that the district attorney's statement that "this aggravating factor is perhaps the most serious of any of them" was not improper, particularly when viewed in light of defense counsel's earlier argument.

## VII.

[7]  The defendant combines two assignments of error, first contending that the district attorney improperly indicated to the jury that it could determine the existence of the mitigating factor, the lack of any prior criminal activity, and second that the trial judge erred in his instructions concerning that mitigating factor. Defendant did not object at trial to the prosecutor's remark or to the trial judge's instructions.

Subsequent to reminding the jury that the evidence indicated the defendant pled guilty to communicating threats, the district attorney stated to the jury, "you make your decision about whether you think his lack of any prior criminal history is a mitigating factor." Contrary to defendant's assertions, we do not believe this statement constitutes error. "[T]he weight a mitigating circumstance is assigned is entirely for the jury to decide. It follows that counsel is entitled to argue what weight circumstances should ultimately be assigned." *State v. Craig*, 308 N.C. 446, 460, 302 S.E. 2d 740, 749. Here, the prosecutor's remark clearly goes to the weight the jury should attach to this mitigating factor.

Additionally, the defendant argues that the trial judge should have given a peremptory instruction to the jury that the defendant had no significant history of prior criminal activity. Instead, the trial court simply instructed that:

Mitigating Circumstance No. 1, first you should consider whether or not the defendant, John Thomas Noland, had a significant history of prior criminal activity. The mitigating circumstance listed is that,

"The defendant had no significant history of prior criminal activity."

You can consider this.

Significant means important or notable. Whether any history of prior criminal activities is sufficient is for you to determine from all the facts and circumstances that you find from the evidence. However, you should not determine whether it is significant only on the basis of the number of convictions, if any, in the defendant's record. Rather, you should consider the nature and quality of the defendant's history, if any, in determining whether it is significant.

You would find this mitigating circumstance if you find that any criminal activity presented to you during the course of this trial is not significant and that this is not a significant history of prior criminal activity that the defendant — of the defendant's prior criminal history.

Now Members of the jury, in this regard, Susan Milton offered evidence for the State, during the course of the trial and by way of cross-examination, testified that John Thomas Noland, Jr., had not been in any trouble with the law while they were married. He did plead guilty to communicating threats to her family in 1981 and paid the Court costs. Communicating threats is a violation of G.S. 14-277.1; and, it is a misedmeanor [sic].

In addition to that, John Thomas Noland's mother, Nanny Noland, testified that her son had never been in any trouble prior to these incidents.

Where all the evidence in a case, if believed, tends to show that a particular mitigating factor exists, a peremptory instruction is proper. *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979). However, a peremptory instruction is inappropriate when the evidence surrounding that issue is conflicting. *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, --- U.S. ---, 74 L.Ed. 2d 622 (1982).

The mitigating circumstance with which we are concerned, N.C. Gen. Stat. § 15A-2000(f)(1), does not speak in terms of "criminal convictions," but rather in terms of "criminal activity." Thus this subsection does not necessarily restrict the jury's consideration to only prior convictions. *See State v. Stokes*, 308 N.C.

634, 304 S.E. 2d 184 (1983). The evidence reveals, as the trial court noted, that the defendant communicated threats and was convicted of that charge. The defendant's former wife testified that on several other occasions defendant communicated threats and at least once committed an assault on a female. Clearly this constituted some evidence of criminal activity. Whether this evidence was sufficient to constitute significant history of criminal activity, thereby precluding a finding of this factor, was for the jury to decide. The assignment of error is overruled.

## VIII.

[8] Defendant's next contention is that the prosecutor improperly and prejudicially argued that the imposition of a sentence of death would be a deterrent to future dangerous activity by the defendant. The prosecutor argued:

> You all are going to have to make a decision. We're trying to run a society. I think we all some times take our society for granted. We see the televisions and computers and the cars and all the wonderful things we have, and I think we tend to forget that society is a gunshot away, or the lack of society is a gunshot away and maybe three meals away.
>
> And I think we build a society every day in what we all do. And, if all the people in this room were starting out to build a society, tomorrow, and, we all depended on each other for the conduct of our society and our survival as a civilization, and, John Noland was among us, having killed his father-in-law and having killed his sister-in-law, two entirely innocent people. And we were trying to decide the rules or how we were going to conduct our society, and whether we were going to be safe in our beds, I think the decision would be the death penalty.

Defendant failed to object at trial to this alleged improper argument. We do not, in any way, find these particular remarks improper, and they certainly do not amount to such gross impropriety as to require the trial judge to act *ex mero motu. See State v. Boyd*, 311 N.C. 408, --- S.E. 2d --- (8/28/84). This assignment of error is without merit.

## IX.

[9]  Defendant's next contention is that the trial court's framing of the sentencing issues unconstitutionally precluded the jury from considering the mitigating circumstances at each appropriate issue stage of the sentencing determination process. Defendant did not object at trial to these issues. The issues in the case *sub judice* are substantially the same as those repeatedly approved by this Court. *See e.g. State v. Oliver and Moore,* 309 N.C. 326, 307 S.E. 2d 304 (1983). The issues are constitutionally valid and free of prejudicial error. The assignment of error is overruled.

## X.

[10]  Defendant next contends that the trial court erred in its instructions to the jury during the sentencing phase by placing on the defendant the burden of persuasion by a preponderance of the evidence as to the existence of mitigating circumstances. Defendant did not object at trial. Furthermore, this Court has repeatedly ruled that the burden of persuasion as to the existence of mitigating circumstances is on the defendant. *See State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197. We overrule this assignment of error.

## XI.

[11]  In his next assignment of error the defendant argues that the trial court committed prejudicial error in its jury instructions concerning the mitigating circumstance set out in N.C. Gen. Stat. § 15A-2000(f)(2) that "the capital felony was committed while the defendant was under the influence of mental or emotional disturbance," because the trial court did not peremptorily charge the jury that this circumstance existed. Defendant made no request at trial for such an instruction.

As discussed earlier in this opinion, a peremptory instruction is proper only when *all* the evidence, if believed, tends to show that a particular mitigating factor exists. We disagree with the defendant's contention that *all* the evidence in this case tended to show that he was under the influence of a mental or emotional disturbance. The evidence was conflicting.

Evidence of defendant's emotional state subsequent to his separation from his wife was adequately presented through the

testimony of witnesses for the defendant. The anguish and despair a marital separation may cause is not disputed. Furthermore the impact of such an event may vary according to the person. It appears from the medical testimony that the effect of marital separation would be more profound on a person diagnosed as suffering from a borderline personality disorder with narcissistic features. Defendant's evidence also revealed that he was involuntarily committed in May 1981, treated for his problems, and thereafter released.

The State offered evidence which tended to contradict the defendant's contention that he was under a mental disturbance during the occurrence of the criminal acts. The defendant bought the pistol, determined to be the murder weapon, from an acquaintance two days prior to the shootings. He assured the person from whom he purchased the gun that he did not plan to shoot anyone. The acquaintance's testimony disclosed no evidence of defendant's being in an emotional state at that time.

Additional evidence presented by the State tended to show that the defendant killed and wounded his victims in the exact order and manner in which he threatened. Nothing in the testimony of the witnesses to the killing suggested that the defendant appeared to be acting under a mental disturbance. The emotion that he displayed was anger. The defendant was confronted by law enforcement officers within an hour of the shootings. The officers noticed nothing peculiar about his eyes, his speech, or his walk. He commented that he knew he had killed two people. Nothing in his actions led the officers to believe that he was not in control of his faculties.

The State argues that its evidence "showed the defendant going through a detailed series of steps. . . . The events before, during, and after the killing suggested deliberation, not the frenzied behavior of an emotionally disturbed person." In light of all the evidence presented, a peremptory instruction would have been improper in this instance. Defendant's mental state was appropriately considered and determined by the jury.

## XII.

[12] Defendant next argues that the trial court erred by not requiring the jury to list each mitigating factor it found on the issue

sheet. We addressed this same issue in *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 and *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), and found no merit in this contention. We reiterate that although we find no such requirement in our statutes, the better practice is to require the jury to specify mitigating factors found and not found to facilitate appellate review. This assignment of error is overruled.

## XIII.

[13] In his final assignment of error, defendant contends that the trial court erred in instructing the jury that it was required to reach a unanimous decision in its determination of mitigating factors. Defendant maintains that required unanimity unconstitutionally restricts the jury from a full opportunity to consider mitigating circumstances. Defendant failed to object at trial. We have ruled on this precise question adversely to the defendant's position. In *State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144, we found this jury unanimity instruction to be constitutional and in accord with the requirements of *Lockett v. Ohio*, 438 U.S. 586, 57 L.Ed. 2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 71 L.Ed. 2d 1 (1982). We reaffirm our holding in *Kirkley* and, thus, overrule defendant's assignment of error on this issue.

### PROPORTIONALITY

[14] After a thorough review of the transcript, record on appeal and the briefs of the parties, we find that the record fully supports the jury's written finding in aggravation. We further find that defendant's death sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor and that the transcript and record are devoid of any indication that such impermissible influences were a factor in sentencing.

[15] Finally we have determined that the death sentence imposed is neither excessive nor disproportionate to the penalty imposed in similar cases considering both the crime and the defendant. *See State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335.

We recently upheld the death penalty in *State v. Boyd*, 311 N.C. 408, --- S.E. 2d --- (8/28/84), a case not dissimilar from the case *sub judice* in that the murder evolved from the separation of the defendant from a woman he purportedly loved; the defendant

was apparently unable to cope with the separation; prior to the murder, the defendant threatened to kill the victim; and the murder was carefully planned and executed and committed overtly. *See State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 U.S. 933, *reh. denied*, 454 U.S. 1117 (1981).

In addition, we have affirmed the death penalty in numerous cases involving death or serious injury to one or more people other than the murder victim. *See State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308; *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203; *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 488 U.S. 907, *reh. denied*, 448 U.S. 918 (1980). *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, *reh. denied*, 451 U.S. 1012 (1981); *see also, State v. Gardner*, 311 N.C. 489, --- S.E. 2d --- (8/28/84). Considering the circumstances surrounding the crimes in this case, together with those in similar cases, we hold that the penalty of death is neither excessive nor disproportionate.

No error.

Justice EXUM dissenting as to sentence.

I believe the evidence here required the trial court to instruct the jury peremptorily that if they believed what all the evidence tended to show they should find as mitigating circumstances (1) the capital felony was committed while defendant was under the influence of a mental or emotional disturbance, N.C. Gen. Stat. § 15A-2000(f)(2), and (2) defendant has no significant history of prior criminal activity, *id.* § (f)(1). I dissent from so much of the majority opinion as finds no error in the judge's failure to so instruct. I also believe the death sentence under the circumstances of this case is excessive and disproportionate when compared to sentences in other similar cases. I dissent, therefore, from so much of the majority's opinion which holds to the contrary. My vote in the case is to remand the matter for the imposition of life imprisonment and, failing that, to remand for a new sentencing hearing.

### I.

With regard to peremptory instructions on mitigating factors in a capital case, our rule is that where "all of the evidence in the case, if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *State v. Johnson*, 298 N.C. 47, 76, 257 S.E. 2d 597, 618 (1979). A peremptory instruction does not require the jury as a matter of law to find the existence of the circumstance. The jury is still left free to believe or disbelieve the evidence tending to show the existence of the circumstance. We said in *State v. Johnson, id.* at 75, 257 S.E. 2d at 617, with regard to the impaired capacity mitigating circumstance:

'When all the evidence offered suffices, if true, to establish the controverted fact, the court may give a peremptory instruction—that is, if the jury find the facts to be as all the evidence tends to show, it will answer the inquiry in an indicated manner . . . . A peremptory instruction does not deprive the jury of its right to reject the evidence because of a lack of faith in its credibility.' *Chisolm v. Hall*, 255 N.C. 374, 376, 121 S.E. 2d 726, 728 (1961).

### A.

All evidence in the case, both from the state and defendant, demonstrates without contradiction that these tragic killings were the result of defendant's mental illness exacerbated by the loss, through separation, of his wife and children.

Defendant met Susan Milton in 1970 while she was in high school and he, aged twenty-two, had been discharged under honorable conditions from the Navy. They were married in 1971 when Susan Milton was eighteen; and two daughters, aged nine and six at the time of the trial in 1982, were born of the marriage. They separated four or five times before the final separation on 3 March 1981.

According to the state's evidence defendant had back surgery in December 1980 which caused him to be unemployed until the parties' final separation. During this time Susan Milton was working full time and defendant tended to the house and children. After the March 1981 separation, "it was extremely difficult for [defendant] to cope with the girls' being gone." Defend-

ant called his estranged wife by telephone "on a number of occasions about the kids and about [her]." On 19 June 1981, the day after defendant's birthday, Susan Milton and the children left to live with her sister in California without telling defendant. During the marriage defendant "didn't really like to be around people that much, too often." He preferred to remain home with his wife and children. Defendant also developed a particularly close relationship with his father-in-law, one of the victims, and "thought as much, if not more, of [his father-in-law] than he did his own."

The state's evidence further tended to show that after the March 1981 separation and before Susan Milton left with the children to go to California, defendant "had almost lost control of himself . . . ." When he was able to see the children "he would cry a lot in front of . . . them. I don't know if it was from seeing them or that I would say that I was not going to go back with him to be a family again." Defendant "was constantly begging [his wife] to come back home and bring the kids" and never gave up hope that his family would be together again. Defendant "was more or less a loner. He liked just for us [the family] to be there by ourselves; and, that was it."

Defendant's evidence tended to show as follows: After the March 1981 separation he stayed briefly at the YMCA and then moved in with his parents. At his parents' home he "cried constantly [and] kept getting worse and worse. He really loved his kids." His parents became concerned enough over defendant's emotional condition and suicidal tendencies that they arranged for him to consult with the Mecklenburg Mental Health Center where, after being hospitalized for several weeks, he lost "about 40 pounds." Defendant and his estranged wife continued, after she moved to California, to communicate frequently by telephone. The telephone conversations resulted in defendant's further emotional upset.

Dr. Avelina Reback, a staff psychiatrist at the Mecklenburg Mental Health Center, testified concerning defendant's course of treatment there. She saw defendant in April 1981 and recommended "partial hospitalization" at the Center. By 13 May 1981 she decided defendant needed full, in-patient hospitalization. Defendant was suffering from depression and anti-depressant medication was prescribed. As of 19 May 1981 defendant was

"very depressed, despondent, withdrawn and hopeless. . . ." He was, in the opinion of Dr. Reback, "mentally ill and dangerous." Dr. Reback described defendant's behavior as follows:

> At the time, he was oriented as to time, place, person and situation; but, he was very depressed. And, his whole affect, the way the patient looks when we look at them, was very flat or bland, you know, he has no expression on his face. And, very slow movement; his head was bowed down and continuously wringing his hands, which showed agitation and excited. He hardly spoke. He would not — he would not talk spontaneously unless we asked him; and, he would only answer in one syllables.

> His thinking however was logical; but, he was so depressed that it took time for him to respond when asked questions. He was not confused; there was no looseness of thinking; and, he was well aware of what he was saying. And, his responses to the questions, they were not out of what we were asking him.

> . . . .

> He talked about his depression, his hopelessness and his despondency.

> There were no evidences of bizarre thinking; his thinking was very clear. However, he has no insight at all into his problems; at that time, his judgment was poor.

Dr. Reback's final diagnosis was that defendant suffered from "borderline personality with narcissistic characteristics [and] crisis neurosis." She said this diagnosis "is a mental illness because it makes him dysfunctional. He is unable to function; he is unable to form lasting personal relationships; he is unable to be flexible within his social and work atmosphere or situations." She said, "The only . . . friend he had was probably his family and his wife."

On 21 May 1981 the Mecklenburg County District Court after a hearing ordered defendant committed to Broughton Hospital for the mentally ill in Morganton after finding defendant "consents to commitment [and] by clear and convincing evidence, is mentally ill and dangerous to himself."

Defendant was admitted to Dorothea Dix Hospital in Raleigh on 20 May 1982 where he was treated by Dr. Billy Royal, a psychiatrist at the hospital. After examination and testing, Dr. Royal found evidence in defendant "of depression, insecurity, anxiety and low self-esteem." After obtaining a history from defendant's family, Dr. Royal "learned that Mr. Noland had a history of mental illness" with in-patient and out-patient treatment at the Mecklenburg County Mental Health Center and in-patient treatment on one occasion at the Veterans' Hospital in Salisbury. Dr. Royal learned "that there had been a history of some instability and different aspects of mental illness that extended back for quite a number of years." Dr. Royal testified, in essence, that defendant had "very primitive [childlike] emotional needs" which were largely met by his wife, children, and his wife's father. The separation cut off these relationships and defendant's personality structure . . . was not such that he could deal with the loss. . . ." Dr. Royal said, "After the separation [defendant's] ability to cope deteriorated." Until a time shortly before the killings defendant "felt that he was getting some positive feedback from his separated wife, about the possibility of their getting back together on a permanent basis; and/or working out some continued involvement with his children . . . so that he would have that kind of relationship and gratification." Dr. Royal diagnosed defendant as suffering from "dysthymic disorder, which is a new word for depressive neurosis, which is the word we used to use" and "borderline personality problems, personality disorders." Dr. Royal said, "All of these diagnoses are mental illnesses." Dr. Royal did not think defendant "was psychotic" at the time of the killings and, although he was not able to say definitely about it, "I think . . . there is a suggestion that he may not have known the difference [between right and wrong] in terms of how he functioned."

Shortly before the killings, Dr. Royal noted that defendant "had been in some continued distress. . . . Had had some recent contact with his wife with some suggestion or certainly interpretation on his part, that the resolution of their separation was not going to occur; and, that he was probably not going to have contact with his children . . . on any basis that was established."

There is no evidence which contradicts the testimony that defendant was suffering from a mental illness at the time of these

killings. The majority alludes to the fact that defendant purchased the murder weapon two days before the shootings, assuring the seller that he did not plan to shoot anyone; killed his victims in the manner in which he predicted he would; and did not appear "peculiar" to law enforcement officers within an hour of the shootings. None of this is evidence tending to show that defendant was not suffering from a mental illness. Mental illnesses such as defendant's are often not readily observable nor do they negate the ability to plan ahead and think logically. Dr. Royal testified that persons suffering from mental illnesses like defendant's can function "so that someone in general would not see that they had any mental illness." Dr. Reback pointed to defendant's ability to think logically, saying "he was oriented as to time, place, person, and situation. . . . His thinking was logical. . . . He was not confused."

Defendant's mental illness does not, of course, excuse the crime. It was, however, substantiated by overwhelming, uncontradicted, evidence. Defendant was, therefore, entitled to have the jury peremptorily instructed that if they believed what all the evidence on the point tended to show, they would find the existence of the mitigating circumstance that the capital felonies were committed while defendant was under the influence of a mental or emotional disturbance.

B.

All the evidence in the case tended to show that defendant had no significant history of prior criminal activity and the jury should have been peremptorily instructed on this mitigating circumstance. The evidence was that defendant had "two or three times" communicated threats to his wife's family by telephone. On one occasion a "peace warrant" was taken out against defendant, and as a result of court proceedings pursuant to the warrant defendant was fined $30 and ordered to pay the costs of court. The only other evidence of criminal activity was defendant's wife's testimony that in March 1981, "the night before I left him he hit me." The jury should not have been permitted to speculate on whether these instances constituted a significant history of prior criminal activity. I am satisfied that, as a matter of law, they do not. The jury, consequently, should have been peremptorily instructed that if they believed as all the evidence tended to

show on this point, they would find defendant had no significant history of prior criminal activity.

## C.

An error is reversible if there is "a reasonable possibility that had the error . . . not been committed, a different result would have been reached" at trial. N.C. Gen. Stat. § 15A-1443(a).

Since the jury did not specify whether it found these mitigating circumstances to exist, we must assume on this aspect of the case that it did not find them. Had the jury found the existence of these circumstances, there is a reasonable possibility that their sentence recommendation would have been different. Had the jury been given a peremptory instruction on these circumstances, there is a reasonable possibility that it would have found them to exist. Therefore, failure to give the peremptory instructions amounts to reversible error which entitles defendant to a new sentencing hearing.

## II.

Finally, this sentence of death, considering both the crime and defendant, is excessive and disproportionate. The record clearly shows defendant at the time of these crimes was suffering from a mental or emotional disturbance. Indeed, in conducting our proportionality review we must assume the jury so found. The jury indicated that it found one or more of the mitigating circumstances submitted to exist without specifying which one or ones. Consequently, we must assume on proportionality review that the jury found all mitigating circumstances submitted to exist. *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984). Thus, we must assume that the jury found: defendant has no significant history of prior criminal activity; the murders were committed while defendant was under the influence of mental or emotional disturbance; defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; defendant was a loving and kind father to his children; defendant voluntarily sought help for his mental illness; defendant did not resist arrest or try to escape when confronted by law enforcement officers; and defendant has expressed remorse for his crimes. Balanced against all of these mitigating circumstances, there is only one aggravating circumstance, *i.e.*, the

murders were a part of a course of conduct which included crimes of violence against other persons. The victims were persons with whom defendant had had a close personal relationship. One of the victims had been loved by defendant as a substitute father. The impetus for the killings was defendant's estrangement from his wife and children.

Our job on proportionality review

> is to compare the cases at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson, supra,* 310 N.C. at 648, 314 S.E. 2d at 503.

It is true, as the majority notes, that in *State v. Boyd,* 311 N.C. 408, --- S.E. 2d --- (1984), and *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214, *cert. denied,* 454 U.S. 933, *reh. denied,* 454 U.S. 1117 (1981), this Court sustained death sentences where the murder victim was an estranged lover in *Boyd,* and an estranged wife in *Martin.* Both *Boyd* and *Martin* are easily distinguishable from the instant case. In *Boyd* the victim died as a result of 37 stab wounds inflicted by defendant. The jury found as aggravating factors that the murder was especially heinous, atrocious or cruel and that defendant had previously been convicted of a violent felony. The Court in *Boyd* said at the close of its proportionality review that "scanty evidence of emotional or mental disorder, which, together with defendant's significant history of criminal convictions and the heinous nature of the crime, including suffering of the victim, provide the basis for a penalty of death." In *Martin,* likewise, the murder of defendant's estranged wife was particularly brutal. Defendant shot her twice causing her to be disabled. He then dragged her across the room,

held her up with one hand while he struck her four or five times with the pistol, slung her against the wall and hit her again several times with the pistol while she begged him not to hit her any more. Then in the presence of her small child and with the victim pleading for her life and asking for forgiveness, defendant fired three more shots, two of which, entering her head, were fatal. The jury found the murder to be especially heinous, atrocious or cruel and found no mitigating circumstances. The jury expressly found that defendant was not under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct was not impaired.

In every case so far, affirmed on appeal, where murders have arisen out of prior close relationships and estrangement of loved ones, absent the kind of brutality present in *Boyd* and *Martin,* our juries have returned sentences of life imprisonment. *State v. Hinson,* 310 N.C. 245, 311 S.E. 2d 256 (1984) (defendant killed husband); *State v. Woods,* 307 N.C. 213, 297 S.E. 2d 574 (1982) (wife killed husband); *State v. Parton,* 303 N.C. 55, 277 S.E. 2d 410 (1981) (defendant killed girlfriend with whom he had gone fishing); *State v. Colvin,* 297 N.C. 691, 256 S.E. 2d 689 (1979) (defendant killed wife after marital difficulties and after threatening to kill her "before he would allow her to take his children away from him"); *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980) (defendant killed estranged wife). This result holds true for every case in which there was substantial evidence of impaired capacity or mental or emotional disturbance. *State v. Anderson,* 303 N.C. 185, 278 S.E. 2d 238 (1981) (defendant killed woman with whom he had previously lived but from whom he was separated at the time of the murder; there was evidence that defendant suffered from a mental disorder); *State v. Clark,* 300 N.C. 116, 265 S.E. 2d 204 (1980) (defendant killed father; evidence on insanity plea that defendant was paranoid schizophrenic); *State v. Franks,* 300 N.C. 1, 265 S.E. 2d 177 (1980) (defendant killed girlfriend with whom he lived; evidence that defendant suffered from chronic undifferentiated schizophrenia).

In *State v. Boyd, supra,* in which this Court sustained a death penalty where the victim was an estranged lover, the Court justified its conclusion that the penalty was not disproportionate in light of other similar cases in which life imprisonment had been imposed on the ground that in these other cases "there was evi-

dence that the defendants were suffering from legitimate mental or emotional disorder." Here there is substantial evidence that defendant was suffering from a mental or emotional disturbance. Indeed, as I have earlier pointed out, I think all the evidence tends to show this.

The sentence of death here, therefore, when compared with sentences rendered in other similar cases is excessive and disproportionate.

Justices MARTIN and FRYE join part II of this dissent.